**BMK CORPORATION, Respondent,**

v.

**The CLAYTON CORPORATION,
Appellant.**

**No. ED 87110.**

Missouri Court of Appeals,
Eastern District,
Division Five.

June 5, 2007.

Joe D. Jacobson, Clayton, MO, for appellant.

Theresa A. Phelps, for respondent.

PATRICIA L. COHEN, Judge.

### Introduction

The Clayton Corporation ("Clayton") appeals from the trial court's judgment entered after a jury verdict in favor of BMK Corporation ("BMK") on its claims for breach of contract, tortious interference with a business expectancy and intentional misrepresentation. Clayton argues that the trial court erred in submitting all three claims to the jury—or in failing to grant its Motions for JNOV and a New Trial—and in entering damage awards on all three claims. We affirm.

### Facts and Procedural History

In 2000, Jay–Max Sales ("Jay–Max"), an equipment supplier to coal mines in Colorado, Utah and Wyoming, received repeated requests from its mine customers for an alternative to the prevailing underground mine foam[1] product, Versi–Foam, which had become increasingly expensive because of its dominant market share. As

---

1. Mine foam is a product used to aid in the ventilation of a mine. In order to ensure adequate fresh air in an active mine, the general practice is to close off all of the shafts of a mine except the one currently in use. Miners use "Kentucky blocks"—or large metal structures—to block off the dormant arteries and apply mine foam—a polyurethane sealant—to seal the gaps and cracks between the walls and Kentucky blocks in order to prevent air leakage, maximize ventilation in the active shaft of the mine and help prevent the spread of flames in case of fire.

a result of this demand, Jay–Max saw an opportunity to sell and market a new product to its existing client base and began searching for an alternative mine foam supplier. In the course of its research, Jay–Max discovered BMK[2] through a mutual acquaintance in the market. After some initial discussion, Jay–Max and BMK began studying the current and potential market demand for an alternative mine foam formulation, with James Fletcher, the Vice–President of Jay–Max, contributing his contacts in the region's mines and Jim Boehm, the CFO of BMK, contributing his technical knowledge of the mine foam product. Fletcher, Boehm and Todd Keske, BMK's Marketing Manager, developed a marketing plan, based in part on a list of Jay–Max customers in Colorado and Utah and then met in Colorado to discuss the logistics of distributing an alternative mine foam product to the various Western mines. They conducted surveys of Colorado and Utah mines, obtained oral reports of mine foam usage and pricing information and acquired information about upcoming events—such as shaft closings—that might increase demand for mine foam.

As a result of its research, BMK projected gaining approximately 10% of the market share in the mines where Jay–Max currently did business during its first year, with a second year sales target of between $1 and $1.5 million and a third year target of between $2 and $2.5 million in sales. BMK also intended to sell mine foam outside of the Jay–Max region to Peabody Coal, at which both Keske and Boehm had close contacts, setting a sales target of $100,000.

Jay–Max and BMK initially used FOMO Products, a mine foam manufacturer, to supply their product. In September 2000, after concluding their market study and research, BMK and Jay–Max entered into a two-year written distributorship agreement whereby Jay–Max became BMK's representative to sell and market FOMO mine foam at a price of $180 per kit. After securing its distributorship contract with Jay–Max, however, BMK did not enter into a supply agreement with FOMO for its mine foam formulation, because, at the last minute, FOMO refused to agree to a long-term, exclusive agreement to sell to BMK, expressing its intent, instead, to bypass BMK and sell directly to Jay–Max.

BMK then contacted Clayton, whose IBM division had begun manufacturing its own mine foam product in the late 1990s but had yet to distribute it in the Western mine market, to discuss a possible long-term distributorship agreement with exclusivity provisions. During the course of their negotiations, BMK explained that it intended to sell Clayton's mine foam through a "two-tier connected distribution" arrangement, but, as a result of its experience with FOMO, refused to disclose the name of its "second tier" distributor, Jay–Max, to Clayton until just before the parties executed their agreement.

In early November, the parties settled upon the terms of the "Agreement of Joint Cooperation" ("Agreement"). The Agreement had a four-year duration, with early termination "for cause" provisions. Under the Agreement, Clayton pledged to supply mine foam products and accessories to BMK, and BMK undertook to distribute the products and develop further markets for Clayton. Pursuant to the Agreement, BMK provided Clayton with a confidential list of its customers and/or suppliers and Clayton promised not to sell to certain

---

2. BMK is a subsidiary of Foam Supplies, Inc., a company that had been producing industri- al foam for decades.

companies and mines, including those set forth in the confidential lists, for twelve months.[3] The Agreement also provided that BMK and/or its distributors would not sell to any active mine accounts of Clayton during the term of the Agreement. The Agreement required BMK to sell $400,000 (with $50,000 variance) of mine foam to the mining industry in Colorado and Utah within twelve months of the date of execution.

On November 13, 2000, Michael Sites, Director of Sales for Clayton's IBM division, sent an unsigned copy of the Agreement[4] to Boehm for his signature and the inclusion of BMK's protected customer and target list. On November 14, 2000, Boehm called Sites to place an initial order, disclosed Jay–Max as BMK's distributor, and two days later, faxed a signed copy of the Agreement back to Sites. On November 16, however, May Ellen Hoffman, IBM's National Sales Manager, faxed Jay–Max an offer for a four-year mine foam supply contract at $150/kit. While Clayton did not offer Jay–Max exclusivity, it did require Jay–Max to market only Clayton's mine foam. Hoffman claimed that she faxed the offer because a Clayton sales representative had told her "Fletcher wanted it now," not because Sites had directed her to send it. On November 20, 2000, however, when Sites realized the offer did not contain a signature line for Jay–Max to sign and accept, he faxed a "revised" letter to Jay–Max with an "acceptance" signature line and then forwarded a copy of the revised letter to Mueller via email.

When Fletcher received the offer, he contacted Boehm and faxed him a copy because "it didn't feel right for somebody to make another offer when we already had a contract in place." Boehm then immediately protested to Sites, who had yet to sign the agreement. Sites told Boehm that he did not know Mueller had sent the offer to Jay–Max, and immediately revoked it. On November 21, 2000, Sites signed the Agreement with BMK. As a result of Clayton's offer to Jay–Max, BMK was forced to lower its $180/kit price to match the $150/kit price offered by Clayton.

Almost immediately following the execution of the contract, BMK experienced several problems and delays. Despite a previous recommendation from several experts in the field, Clayton had failed to have its mine foam product atomization tested by the U.S. Mine Safety and Health Administration ("MSHA").[5] As a result, until it acquired the MSHA letter, BMK was forced to halt sales. BMK immediately initialized the atomization testing process and procured the MSHA letter on its own initiative and without assistance from Clayton.[6]

In early 2001, BMK discovered that Clayton was attempting to sell its product to BMK's distributors and customers at a price lower than that quoted by BMK.

3. After twelve months, the parties agreed to review and renegotiate the companies and mines on their respective lists.

4. The Agreement was actually entered into between BMK and Convenience Products, which is a fictitious name that Clayton uses for doing business in Missouri.

5. The purpose of the MSHA atomization test was to certify that a mine operator could apply the foam underground without having to wear a powered air respirator or self-contained breathing apparatus. A Western mine would not buy a mine foam product without the MSHA letter.

6. The Clayton employee who developed the mine foam admitted that, as of the date of the Agreement, because the product lacked MSHA certification, it was not a "first-class product" as required by the Agreement.

Specifically, Mueller was offering Clayton's mine foam kits to Clayton distributors in BMK's exclusive territory—by selling to BMK's mines—at prices higher than the Agreement required BMK to pay, but lower than BMK/Jay–Max were offering to their customers.

On April 17, 2001, BMK sent a letter to Clayton requesting that: (1) Clayton agree to extend the time necessary to meet the target sales volumes by six months; and (2) Clayton offer BMK some relief in the pricing under the Agreement. On April 19, 2001, Clayton sent a letter to BMK assenting to BMK's request for a six-month extension to the Agreement, but rejecting any price relief.

On April 30, 2001, MSHA issued an atomization test letter for Clayton's mine foam. BMK resumed its sales attempts and, over the next two months, sold sufficient volumes of mine foam to satisfy the Agreement's first-year sales targets. The MSHA letter was so significant to the sale of Clayton's mine foam that it immediately highlighted portions of the letter on its packaging, product brochures, and marketing materials.

On June 28, 2001, Sites made an unplanned and unannounced visit to the Jay–Max offices in Colorado, and informed Fletcher that Clayton had terminated BMK as its distributor. While at the Jay–Max offices, Sites made three days of direct sales calls to mines and distributors in BMK's protected territory. On July 19, 2001, approximately three months after it had agreed to extend BMK's first-year sales target by an additional six months, Clayton notified BMK of its intent to terminate the Agreement and cease performing its obligations thereunder. Although Sites based termination on BMK's "failure to meet targeted sales goals," under the original Agreement, BMK had four months remaining and, under the Agreement's extension, ten months remaining. Initially, BMK continued to buy Clayton's mine foam and service its mine customers, but in November, 2001, Clayton cancelled BMK's purchase order, because BMK had "past-due" unpaid invoices. At that time, BMK did not have any past-due purchase orders. After canceling BMK's order, Sites contacted Jay–Max and informed Fletcher that if he wanted to order mine foam, he should order it "direct" from Clayton. In late 2001, Jay–Max stopped buying mine foam from BMK, and began buying it from Clayton.

BMK subsequently filed suit against Clayton, alleging breach of contract, tortious interference with a business expectancy, intentional misrepresentation and breach of an implied covenant of good faith and fair dealing. Clayton counterclaimed for goods accepted, suit on account and quantum meruit. Following a jury trial, the trial court directed a verdict in favor of Clayton on BMK's breach of implied covenant of good faith and fair dealing. The jury found in favor of BMK on its claims for breach of contract, tortious interference with a business expectancy and intentional misrepresentation, and awarded BMK $1,000,000, $100,000 and $100,000 respectively. The jury also awarded BMK $400,000 in punitive damages on its claim for tortious interference with a business expectancy and $400,000 in punitive damages on its claim for intentional misrepresentation. The trial court found in favor of Clayton on its counterclaim and awarded Clayton a total amount of $71,652.68. This appeal followed.

### Standard of Review

We review a trial court's denial of a Motion for JNOV *de novo* to determine whether the plaintiff has made a submissible case. *Coggins v. Laclede Gas Co.*, 37 S.W.3d 335, 338 (Mo.App. E.D.

2000). To make a submissible case, a plaintiff must present substantial evidence regarding every fact essential to liability. *Id.* "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case." *Id.* In determining whether a plaintiff has made a submissible case, we presume that the plaintiff's evidence is true and disregard any of the defendant's evidence which does not support plaintiff's case. *Id.* at 339. We view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff. *Id.* "It is only where there is a complete absence of probative fact to support the jury's conclusion that this Court will decide the plaintiff did not make a 'submissible case.'" *Stehno v. Sprint Spectrum, L.P.,* 186 S.W.3d 247, 251 (Mo. banc 2006).

■ We review the trial court's denial of a motion for new trial for abuse of discretion. "A new trial will be available only upon a showing that trial error or misconduct of the prevailing party incited prejudice in the jury." *Echard v. Barnes–Jewish Hosp.,* 98 S.W.3d 558, 567 (Mo.App. E.D.2002).

### Discussion

### A. Breach of Contract

In its first point on appeal, Clayton argues the trial court erred in submitting Instruction No. 7 to the jury and in denying Clayton's Motion for a New Trial, because substantial evidence did not support each disjunctive allegation in the jury instruction. Specifically, Clayton argues there was no substantial evidence regarding BMK's claim that Clayton was selling

mine foam "directly to any of the mines listed on Schedule D of the agreement." [7]

Instruction No. 7 provided as follows:

Your verdict must be for plaintiff if you believe:

First, plaintiff and defendant entered into an agreement under which plaintiff agreed to sell defendant's mine foam products to the mining industry and defendant agreed to allow plaintiff to sell its mine foam products in exclusive territories and/or mines, and

Second, plaintiff was ready to perform its agreement, and

Third, defendant failed to perform its agreement by interfering with plaintiff's ability to achieve sales targets by:

(a) Agreeing to a six month extension of the time within which plaintiff was to meet the minimum net sales to the mining industry, and thereafter terminating the agreement prior to the expiration of that extension; or

*(b) Selling directly to any of the mines listed on Schedule D of the agreement, or*

(c) Failing to supply plaintiff with a first class product; or

(d) Terminating the agreement without cause, and

Fourth, plaintiff was thereby damaged.

(Emphasis added). Schedule D of the Agreement identified the mines to which Clayton agreed to refrain from selling mine foam:

Utah and Colorado mines

---

**7.** BMK argues that Clayton failed to preserve this point, as well as points II, III and V, for appeal. Our review of the record, however, reflects that these points were sufficiently preserved for our review.

Locations outside of Utah and Colorado:

Peabody Coal Company

 Big Mountain 316

 Robinhood # 9

 White's Ranch

 Camp One

 Camp Eleven

 Federa; # 2

 Harris Mine

 Freedom Mine

Lighfoot # 2

Any other Peabody Mines not listed.

United Central Industrial Supply

Champion Mine Supply

Blue Field MFG

Eagle Enterprises

■ To submit a claim to the jury, substantial evidence must support each element of a disjunctive jury instruction. *Bank of Am., N.A. v. Stevens,* 83 S.W.3d 47, 54 (Mo.App. S.D.2002). "Furthermore, in cases involving disjunctive instructions each alternative claim . . . must be able to stand alone and there must be sufficient evidence to support each allegation." *Banther v. Drew,* 171 S.W.3d 119, 122 (Mo. App. S.D.2005). "If there is not substantial evidence for each disjunctive element, the submission of the entire instruction is in error." *Id.* In determining whether the instruction is supported by substantial evidence, we must consider the evidence in the light most favorable to the plaintiff and disregard the defendant's evidence unless it tends to support the submission of the instruction. *Id.*

■ Although Clayton argues that there is no evidence in the record that it sold mine foam directly to any of the mines on Schedule D above, it acknowledges that it did sell mine foam directly to Jay–Max after it terminated its agreement with BMK. Because Jay–Max is not a mine, however, Clayton asserts that its sales to Jay–Max cannot constitute evidence of a violation of Schedule D. Likewise, Clayton contends that BMK cannot rely on the sales made by two of its distributors, R & R and Flame Safety because: (1) they never actually sold mine foam in the Schedule D territories; and (2) any sales by the distributors did not amount to a *direct* sale by Clayton, because the distributors were independent manufacturer's representatives.

The trial court did not err in submitting the instruction to the jury because substantial evidence supported the finding that Clayton breached the Agreement by "selling directly to any of the mines listed on Schedule D." As BMK aptly points out, the instruction lifts this phrase *verbatim* from the Agreement. Clayton's contention that this language must be strictly construed and interpreted without any reference to the remainder of the Agreement or the evidence presented at trial clarifying and explaining the meaning of the provision is erroneous.

■ It is well-settled that "[j]ury instructions are to be read and construed in the light of the issues pleaded and presented upon trial and the evidence adduced, and that the meaning of an instruction is to be determined from its entirety and not from isolated words or phrases." *Fontana v. Davis,* 382 S.W.2d 835, 838 (Mo.App. W.D.1964), *see also Lashmet v. McQueary,* 954 S.W.2d 546, 552–53 (Mo.App. S.D.1997) (concurrence). A jury instruction must be "simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." *White v. Curators of Univ. of Mo.,* 937 S.W.2d 366, 368 (Mo.App. S.D.1996) (internal citations omitted). Instructions should "leave evidentiary detail to the argument of counsel and submit only the

ultimate issues for the jury's resolution." *Id.*

When reviewing jury instructions, we credit jurors "with ordinary intelligence, common sense, and an average understanding of the English language." *Lashmet,* 954 S.W.2d at 552–53. Thus, the trial court was not required to set forth in the instruction an explanation of "selling directly to any of the mines listed on Schedule D of the agreement," and the jury was free to consider the entire context of the Agreement and the evidence presented at trial to determine its meaning. *See also S.P. Pers. Assocs. v. Hosp. Bldg. & Equip. Co., Inc.,* 525 S.W.2d 345, 350 (Mo.App.St.L.1975) (holding that when a reasonable juror can understand the instruction in the light of the evidence presented, the court need not add further evidentiary detail), *Foote v. Thompson,* 407 S.W.2d 637, 640 (Mo.App.K.C.1966) ("The propriety of a questioned instruction must be considered in the light of the evidence and issues to which it relates.")

Throughout the course of the trial, each side proffered its version of the meaning of the phrase "selling directly to any of the mines listed on Schedule D of the agreement," by reference to the phrase itself, the context of the entire contract and testimony regarding the practices of the parties. The parties gave the phrase "flesh and meaning during the course of the trial" such that the jury could determine the meaning of the provision. *See Williams v. Daus,* 114 S.W.3d 351, 371 (Mo.App. S.D. 2003). It is clear from the record that the parties understood that BMK would sell Clayton's mine foam through BMK's distributor in a "two-tier connected distribution" arrangement. The terms of the contract prohibited Clayton from selling to anyone other than BMK in Colorado and Utah. Nevertheless, Clayton, through its distributors, R & R Tool Supply and Flame Safety Supply, clearly attempted to sell mine foam to mines—listed on Schedule D of the Agreement—in Colorado and Utah in early 2001. Clayton attempted to sell to Jay–Max and mines listed on Schedule D of the Agreement—when Sites visited Jay–Max headquarters and falsely stated that Clayton had terminated its contract with BMK—in June 2001. Finally, Clayton sold directly to Jay–Max after November 2001. Substantial evidence supported the trial court's submission of Instruction No. 7 and denial of Clayton's Motion for a New Trial. Point denied.

**B. Tortious Interference with a Business Expectancy**

In its second point on appeal, Clayton argues the trial court erred in submitting BMK's tortious interference claim to the jury and denying its Motion for JNOV, because: (1) Clayton could not have tortiously interfered with the BMK/Jay–Max relationship when Clayton's contract with BMK created the relevant expectancy; and (2) Clayton was justified in interfering with the BMK/Jay–Max relationship because it had a legitimate economic interest to protect.

To establish a submissible case of tortious interference, a plaintiff must adduce evidence of: "(1) a valid business expectancy; (2) defendant's knowledge of the relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Stehno,* 186 S.W.3d at 250. A business expectancy need not be based on an existing contract. *Id.* at 251. Rather, "a probable business relationship that gives rise to a reasonable expectancy of financial benefit is enough." *Id.*

Clayton contends that, but for its agreement with BMK, BMK would not have had any expectancy to sell Clayton's mine foam to Jay–Max. In short, Clayton

argues that because the Agreement created the BMK/Jay–Max expectancy, it was permitted to interfere with the relationship. In support of this contention, Clayton cites two cases: *Maupin v. Hallmark Cards Inc.*, 894 S.W.2d 688 (Mo.App. W.D. 1995) and *Jurisprudence Wireless Communications, Inc. v. CyberTel Corp.*, 26 S.W.3d 300 (Mo.App. E.D.2000).

Clayton's reliance upon *Maupin v. Hallmark Cards Inc.* is misplaced. In *Maupin*, the Court of Appeals for the Western District held that a plaintiff failed to establish a prima facie case of tortious interference with a business expectancy when the defendant refused to deal with the plaintiff. 894 S.W.2d at 696. The court reasoned that refusal to enter into a contract is insufficient as a matter of law to establish tortious interference with a business expectancy because in "such a case the operative rule would be that the defendant had the absolute discretion to deal with plaintiff or with plaintiff's principal, or not to deal with them." *Id.* The facts of *Maupin* are inapposite. Here, the issue is not whether Clayton intentionally interfered with BMK's business expectancy by refusing to deal with BMK, but rather whether Clayton intentionally interfered with BMK's business expectancy by attempting on several occasions—and inevitably succeeding—to sell directly to Jay–Max, BMK's preexisting customer and distributor.

Clayton's reliance on *Jurisprudence Wireless Communications, Inc. v. CyberTel Corp.* also fails to persuade us. In *Jurisprudence*, this Court held that a plaintiff could not establish tortious interference when the contract between plaintiff and defendant created plaintiff's right to secure clients solely for and on behalf of the defendant, because the plaintiff only had an expectancy of future business as a result of the contract. 26 S.W.3d at 302.

We reasoned that when a contract alone creates a business expectancy, plaintiff cannot bring a claim for interference with a business expectancy against a party to that contract. *Id.* Instead, a suit for breach of contract is the proper remedy. *Id. Jurisprudence*, however, is distinguishable from the case at hand. In *Jurisprudence*, the plaintiff only had a relationship—and thus an expectancy of future business—with its clients because of its agency agreement with the defendant. In the present matter, however, Jay–Max had been BMK's customer and distributor prior to the date the parties entered into the Agreement and BMK did not secure Jay–Max as a customer on Clayton's behalf. BMK's expectancy of future business with Jay–Max existed irrespective of its relationship with Clayton.

Put simply, the contract between Clayton and BMK did not alone create BMK's expectancy *vis-à-vis* Jay–Max. BMK and Jay–Max had a business relationship predating BMK's relationship with Clayton and existing wholly separate from it. Neither *Maupin* nor *Jurisprudence* stand for the proposition that a party may not have a valid business expectancy in a preexisting and independent business relationship just because the preexisting relationship relies upon a third-party supply contract to furnish the subject of their agreement.

In addition, the record before us reflects sufficient evidence to support BMK's contention that Clayton's conduct did not simply constitute a breach of contract, but rather was a tortious interference with BMK's agreement with Jay–Max. In November 2001, Clayton provided Jay–Max with quotes for a four-year supply of mine foam at a price of $150 per kit. When Clayton forwarded these quotes, it knew that Jay–Max was the distributor for and had a business relationship with BMK. This quote interfered with BMK's business

expectancy, as set forth in its distributorship agreement with Jay–Max, of selling the mine foam kits to Jay–Max for $180 per kit. Mere months later, when Clayton stopped supplying BMK, Jay–Max terminated its entire relationship by ceasing to buy mine foam from BMK. Jay–Max then began buying the mine foam directly and exclusively from Clayton and continued to do so at the time of the trial. The trial court did not err in submitting BMK's tortious interference claim to the jury.

■■■ Clayton next contends that BMK's business expectancy with Jay–Max was only protected because of the exclusivity provision in the Agreement between Clayton and BMK. Thus, Clayton argues, it was justified in interfering with the contract and as a result, BMK's sole remedy is to sue Jay–Max for breach of contract.

■■■ To establish tortious interference with a business expectancy, a plaintiff must produce, *inter alia*, substantial evidence establishing an absence of justification. *Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. banc 1990). As the Missouri Supreme Court has held, a defendant is justified to interfere in a contract or expectancy when the defendant has a legitimate economic interest in it. *Id.* "One who has a present existing economic interest, such as a prior contract of his own or a financial interest in the affairs of the person persuaded not to enter into a contract, is privileged to interfere with another's business expectancy to protect one's own economic interest." *Id.* Thus, argues Clayton, it cannot be liable for interfering with BMK's business expectancy because the "action complained of was an act which the defendant had a definite legal right to do without any qualification." *Id.*

Clayton's argument is flawed in two respects. First, Clayton's assertion ignores the uncontroverted evidence that it interfered in the BMK/Jay–Max relationship before the parties executed the Agreement and its exclusivity provision. Thus, at the time Clayton sent its November 16, 2000 and November 20, 2000 offers to Jay–Max, Clayton did not have any cognizable economic interest in BMK's exclusive distributorship agreement. It was only after Clayton entered into its agreement with BMK that even an arguable economic interest in BMK's relationship with Jay–Max arose.

■■■ Assuming, *arguendo*, that Clayton had a legally cognizable interest in the BMK/Jay–Max relationship once the Agreement and its exclusivity provisions were in force, Clayton was only justified to interfere with BMK's business expectancies if Clayton did not use improper means. "It is not justification to knowingly procure the breach of a contract where the defendant acts with an improper purpose and seeks not only to further his own interests, but in doing so employs improper means." *Cmty. Title Co.*, 796 S.W.2d at 372, *see also Briner Elec. Co. v. Sachs Elec. Co.*, 680 S.W.2d 737, 741 (Mo.App. E.D.1984) (holding that party who intentionally induces a third person to breach a contract does not interfere improperly with the other party's relationship if the inducing party does not employ illegal or improper means). For purposes of tortious interference with a business expectancy, "improper means are those that are independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any other wrongful act recognized by statute or the common law." *Fabricor, Inc. v. E.I. DuPont de Nemours & Co.*, 24 S.W.3d 82, 95 (Mo.App. W.D.2000) (en banc).

BMK presented sufficient evidence that Clayton premised its offer to supply Jay–Max with mine foam on a misrepresenta-

tion of fact. Mueller testified that she submitted a four-year quote at $150/kit to Jay–Max because Jay–Max had requested that Steve Bertelsen, a Clayton distributor, supply a quote. Fletcher, however, testified that he never solicited the offer from Clayton, had not spoken to Bertelsen since before Jay–Max and BMK had executed their agreement, and that, to the best of his knowledge, Bertelsen was not even licensed to sell mine foam in Colorado. Mueller further testified that Fletcher had specifically requested a four-year quote because Jay–Max wanted to secure a four-year contract with a mine. Fletcher, on the other hand, testified that previous to November 16, 2000, no mine had ever requested a four-year supply contract from Jay–Max. Point denied.

### C. Fraud/Intentional Misrepresentation

In its third point on appeal, Clayton argues the trial court erred in denying Clayton's Motion for JNOV on BMK's fraud/intentional misrepresentation claim because Clayton had a right to terminate the contract for BMK's failure to meet the Agreements first-year minimum mine foam sales targets in states other then Colorado and Utah. In essence, Clayton contends, not that BMK failed to establish a submissible fraud claim, but rather that it convincingly proved its defense that it had a right to terminate the contract.

 The elements of a submissible case of fraud/intentional misrepresentation are: "1) a false, material representation; 2) the speaker's knowledge of its falsity or his/her ignorance of the truth; 3) the speaker's intent that his/her representation should be acted upon by the hearer in the manner reasonably contemplated; 4) the hearer's ignorance of the falsity of the representation; 5) the hearer's reliance on the representation being true; 6) the hearer's right to rely thereon; and 7) the hear-

er's consequent and proximately-caused injuries." *Murray v. Crank*, 945 S.W.2d 28, 31 (Mo.App. E.D.1997). For claims of fraud/intentional misrepresentation in the inducement of a contract, a party may defend by claiming a lawful right to terminate the contract and all rights under it. *Ark Const. Co. v. City of Florissant*, 558 S.W.2d 418, 421 (Mo.App.St.L.1977). When acts or conduct of the defendant, however, prevent full performance, this affirmative defense is inapplicable. *Id.*

 Clayton asserts that BMK's admission that it failed to meet the Agreement's minimum sales targets conclusively establishes Clayton's affirmative defense leaving no factual issues for the jury's determination. In support of this contention, Clayton cites *Brandt v. Pelican*, 856 S.W.2d 658 (Mo. banc 1993).

Clayton's reliance on *Brandt* is unavailing. In *Brandt*, the Missouri Supreme Court reaffirmed the very limited exception to the "general rule that verdict may not be directed in favor of the proponent, that is the party upon whom the law casts the final burden of proof." *Id.* at 664. The Supreme Court held that if the party not bearing the burden of proof admits in his individual testimony the "truth of the basic facts" upon which the proponent's claim rests, the proponent will be entitled to a directed verdict. *Id.* The exception is limited to situations when the "proof establishes beyond all doubt the truth of facts which as a matter of law entitled the proponent to the relief sought, and such proof is unimpeached and uncontradicted." *Id.* The proof here, however, neither establishes the truth beyond all doubt nor is unimpeached and uncontradicted.

For Clayton to prevail on its affirmative defense to BMK's fraud/intentional misrepresentation claim, Clayton had to establish that it was entitled to terminate the

Agreement—at the time it did—because BMK failed to meet its sales projections. Clayton's argument that the trial court erred in failing to direct the verdict in Clayton's favor ignores the evidence that Clayton: (1) anticipatorily repudiated the Agreement after only eight months; (2) interfered with and hindered BMK's ability to meet its targeted goals for the sale of mine foam; (3) agreed to extend BMK's deadline to meet its sales goals for an additional six months, only to later renege on its agreement. Further, BMK presented evidence—through three separate calculations—that it was on course to meet its sales targets, and that Clayton lacked any knowledge of BMK's actual sales to the mining industry at the time of termination and did not have any basis to determine whether or not BMK was capable of meeting these goals.

We cannot say that Clayton was entitled, as a matter of law, to terminate its agreement with BMK for "failure to meet target sales goals." It is well-established that a party to a contract who prevents or hinders the other from executing its obligations cannot rely on the other's non-performance to escape its obligations. *Ken Cucchi Const., Inc. v. O'Keefe*, 973 S.W.2d 520, 526 (Mo.App. E.D.1998). Although Clayton cites *Chappee v. Lubrite Refining Co.*, 337 Mo. 791, 85 S.W.2d 1034, 1036 (1935), for the proposition that the action of one party terminating a contract according to its terms prevents the other from asserting rights under the contract, *Chappee* is distinguishable from the case at hand. In *Chappee*, the party claiming rights under the contract had failed to meet minimum purchase requirements after the entire period of time provided by the contract, while, in the present matter,

Clayton did not provide BMK with the entire original contractual term of twelve months—much less the additional six months it had agreed to—before claiming BMK failed to satisfy its obligations. *Id.* Point denied.

### D. Lost Profits

In its fourth point on appeal, Clayton argues the trial court erred in submitting BMK's claims to the jury and denying Clayton's Motion for JNOV, because BMK's evidence of lost future profits was too remote, speculative and dependent upon changing circumstances to be recovered. Specifically, Clayton asserts that BMK did not base its damage calculations on actual facts and the best evidence available and that BMK's speculative combination of quantity, price and cost rendered its lost profit calculations inadmissible.

At trial, BMK presented evidence that the actual damages it suffered as a result of Clayton's anticipatory breach of the Agreement, its tortious interference in the BMK/Jay–Max relationship, and its fraudulent misrepresentations of intent to enter into a long-term, exclusive supply contract totaled $1,977,457.[8] A large percentage of BMK's damage calculation represented the profits lost during the Agreement's four-year period. Boehm, BMK's CFO and a licensed C.P.A., testified about BMK's lost profits, explaining in detail exactly how he calculated the amount of BMK's damages. Boehm relied not only on the testimony of Fletcher, Sites, and Joseph Smith,[9] but also on information obtained by him while preparing BMK's 2000 marketing study and matters discussed and contemplated by the parties during the negotiation and execution of the Agreement. Boehm ex-

8. The jury awarded BMK a total of $1.2 million in actual damages, approximately 60% of the damages claimed by BMK.

9. Joseph Smith is the President of Pyro–Chem, another manufacturer of mine foam.

plained in detail the basis and assumptions for his calculations. Clayton, moreover, dissected and challenged these assumptions during cross-examination and through the testimony of its own expert witness, Thomas Hoops, C.P.A.[10] Boehm calculated BMK's lost profit damages through a straightforward application of revenue and cost numbers, gross and net profit margins, and quantities of product bought and sold.

■■■■■ "Loss of profits refers to the amount of net profits a plaintiff would have realized if its clients had not been lost as a result of defendant's actions." *Meridian Enters. Corp. v. KCBS, Inc.* 910 S.W.2d 329, 331 (Mo.App. E.D.1995) (abrogated, in part, by *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50 (Mo. banc 2005)). As the Supreme Court held in *Coonis v. Rogers*:

> The general rule as to the recovery of anticipated profits of a commercial business is that they are too remote, speculative, and too dependent upon changing circumstances to warrant a judgment for their recovery. They may be recovered only when they are made *reasonably certain* by proof of actual facts, with *present data* for a *rational estimate* of their amount ... when this is made to appear, they may be recoverable.

429 S.W.2d 709, 714 (Mo.1968) (emphasis added). When seeking damages for loss of profits from the interruption of an established business "proof of the income and expenses of the business for a reasonable time anterior to its interruption, with a consequent establishing of the net profits during the previous period, is indispensable." *Id.*

■■■■■ Clayton argues that, under *Coonis*, BMK's lost-profit evidence lacked sufficient certainty to warrant a judgment in its favor. However, the *Coonis* standard of proof only applies in cases where the loss of expected profits flows from the destruction of or injury to a business. *Harvey v. Timber Resources, Inc.*, 37 S.W.3d 814, 818 (Mo.App. E.D. 2001). When a plaintiff sues for damages arising directly out of a breach of contract, he or she need not prove past profits or expenses. *Id.* Thus, "where the breach alleged consists of prevention of performance, the party not in default may generally recover the profits which would have resulted to him from performance." *Id.* at 819. Moreover, where "loss is ascertainable with reasonable certainty from the breach and the profits claimed are not speculative or conjectural and were within the contemplation of the parties when the contract was made" *any* plaintiff—even a new business—may seek lost profits arising from a breach of contract. *Id.* (internal citations omitted).

Clayton attempts to distinguish *Harvey* by asserting that BMK's lost-profit damages did not flow from a breach of contract, but rather from "a contractual right to engage in the business of selling mine foam." Clayton's distinction is not persuasive. As the record establishes, the jury awarded BMK $1 million in lost profits under BMK's breach of contract claim for damages arising from Clayton's breach of the contract. *Harvey's* logic controls the present matter.

■■■■■ In *Harvey*, this Court further held that a plaintiff may recover for lost profits that he or she establishes with reasonable—not absolute—certainty. *Id.* "Certainty," however, "means that dam-

---

**10.** Clayton did not offer its own calculation of BMK's damages or alternative assumptions to be used, relying solely on a challenge to

Boehm's own assumptions through cross-examination and its own expert's testimony.

ages have been suffered and not exact proof of the amount." *Id.* "Where the fact of damage is clear, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court." [11] *Id.* at 819–20, *see also Refrigeration Industries, Inc. v. Nemmers,* 880 S.W.2d 912, 920 (Mo.App. W.D.1994) ("While anticipated profits of a commercial business have historically been regarded as too remote and speculative to warrant recovery, they are recoverable if the plaintiff can prove with reasonable certainty that (1) the defendant's conduct caused some loss of profit; and (2) the extent of the loss."). As the Court of Appeals for the Western District has held, once the plaintiff has established the *fact* of lost profits, to establish the *amount* of lost profit with reasonable certainty, "all that is required by Missouri courts" is that it be supported by the best evidence available. *Refrigeration Industries,* 880 S.W.2d at 920 (emphasis added); *see also Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.,* 155 S.W.3d 50, 55 (Mo. banc 2005); *Smith Moore & Co. v. J.L. Mason Realty & Inv., Inc.,* 817 S.W.2d 530, 534 (Mo.App. E.D.1991) (reasoning that "the requirement that damages be shown with certainty is on the fact of damages and not on the particular amount.") As we held in *Smith Moore & Co. v. J.L. Mason Realty & Investment, Inc.,* a plaintiff produces the best evidence available when he or she produces "all relevant facts tending to show the extent of damages and one is not excused for a breach of contract resulting in damages simply because those damages

may not be established with certainty." 817 S.W.2d at 534. Moreover, a "business owner's testimonial evidence is sufficient to provide the trier of fact with a rational basis for estimating damages to the plaintiff, including lost profits." *Parshall v. Buetzer,* 195 S.W.3d 515, 522 (Mo.App. W.D.2006) (internal citations omitted). Thus, once the plaintiff has put forth the best evidence available, the amount of damages is a question for the jury. *Harvey,* 37 S.W.3d at 818.

■ BMK proved the fact of damage with reasonable certainty and provided a rational basis for the jury to estimate the amount. Clayton does not dispute that it had a four-year exclusive Agreement with BMK and that, at the time the parties entered the Agreement, they contemplated substantial profits resulting from sales of mine foam. As discussed above, BMK presented sufficient evidence that Clayton breached its contract with BMK, causing BMK to lose four years of profits arising out of the Agreement. BMK has, therefore, proved the fact of damage with reasonable certainty.

BMK also presented sufficient evidence to provide the jury with a rational basis for determining the amount of BMK's damages. At trial, Boehm testified to BMK's damages flowing from the breach of the Agreement and explained in detail exactly how he calculated them. Boehm outlined the basis for his calculations, the assumptions underlying them and walked the jury through each step of calculating the net profits lost by BMK as a result of Clayton's breach. Point denied.

### E. Duplicative Damages

*Owsley v. Brittain,* 186 S.W.3d 810, 814 (Mo. App. W.D.2006) (holding that trial courts have considerable discretion regarding the exclusion or admission of evidence, which a reviewing court will only reverse when the trial court abuses that discretion).

---

**11.** As BMK notes, the "usual supervisory power of the court" refers to the power of the trial court to make evidentiary rulings. In this area, a trial court exercises considerable discretion and we will not reverse an evidentiary ruling absent an abuse of discretion.

In its fifth and final point on appeal, Clayton argues the trial court erred in denying Clayton's Motion for JNOV on the tortious interference and intentional misrepresentation claims, because the damages awarded by the jury on those claims duplicated the damages—in that BMK only sought recovery for lost profits—on BMK's breach of contract claim and should have been merged into the breach of contract award. Clayton contends that BMK's failure to segregate its recovery between its various claims created the danger that the jury would award duplicative damages.

"The purpose of an award of damages is to make the injured person whole by money compensation." *Kincaid Enters., Inc. v. Porter*, 812 S.W.2d 892, 900 (Mo.App. W.D.1991). While a single transaction may invade more than one right and an injured party may sue on more than one theory of recovery, a plaintiff may not receive more than one full recovery for the same harm. *Id.* Thus, a plaintiff "must establish a separate injury on each theory." *Norber v. Marcotte*, 134 S.W.3d 651, 661 (Mo.App. E.D.2004). If the damages asserted in two causes of action are the same, the damage awards should be merged. *Davis v. Cleary Bldg. Corp.*, 143 S.W.3d 659, 670 (Mo.App. W.D. 2004). However, if the damages are not coextensive with each other, a party may recover damages proved in two or more causes of action. *Dierker Assocs., D.C., P.C. v. Gillis*, 859 S.W.2d 737, 750 (Mo. App. E.D.1993).

It is well established that a plaintiff need not allocate or differentiate among its total, claimed damages, but must merely establish a separate injury on each theory of recovery. *See Norber*, 134 S.W.3d at 661. At trial, BMK specifically set forth the separate injuries it suffered under each theory and provided damage calculations sufficient to allow the jury to allocate and quantify BMK's damages under each of its theories of recovery.[12] Point denied.

### Conclusion

The judgment of the trial court is affirmed.

BOOKER T. SHAW, C.J., and LAWRENCE E. MOONEY, J., Concurs.

---

**12.** As its injury for its tortious interference theory, BMK established that, as a result of Clayton's interference with Jay–Max, it was forced to decrease its selling price to Jay–Max by $15/kit. As its injury for its fraud/intentional misrepresentation theory, BMK proved that, as a result of Clayton's representations, it lost the ability to enter into a long-term relationship with a mine foam distributor, the ability to purchase mine foam on demand, and its work and investment in developing the Colorado/Utah mine foam market. As to injury for its breach of contract theory, BMK established that, as a result of Clayton's anticipatory repudiation, it lost four years of profits under the Agreement.