

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| ENERJEX RESOURCES, INC., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | WD77228 |
| | ) | |
| JEFFERY HAUGHEY, ET AL., | ) | Opinion filed: |
| | ) | |
| Respondents. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**THE HONORABLE JOHN M. TORRENCE, JUDGE**

Before Division Two:  Joseph M. Ellis, Presiding, Judge,
Victor C. Howard, Judge and Mark D. Pfeiffer, Judge

Appellant EnerJex Resources, Inc. appeals from a judgment entered by the Circuit Court of Jackson County granting summary judgment in favor of Respondents Jeffrey Haughey, Robert Green, and Husch Blackwell, L.L.P.  Appellant contends that the trial court erred in granting summary judgment because its damages theory is supported by Missouri law and is not otherwise inherently speculative.  For the following reasons, the judgment is affirmed.

Formed in 2006, Appellant is an oil development and production corporation that operates primarily in Kansas and Missouri.  In 2007, Appellant decided to attempt its first public stock offering on the American Stock Exchange.  Appellant intended to offer

five million new shares of common stock at $5 per share. Thus, Appellant hoped to raise $25 million in equity from the public offering.

A California investment banking firm ("the banking firm") agreed to underwrite the $25 million public offering. The banking firm further provided Appellant with a projected timeline for the public offering that showed the "road show" presentation for potential investors and the public offering occurring in June 2008. Appellant originally engaged a Nevada firm to prepare the necessary filings for the Securities and Exchange Commission ("SEC"). The banking firm, however, requested that Appellant engage a large law firm to handle the offering. Appellant then sought counsel from Respondent Husch Blackwell. Appellant's CEO Stephen Cochennet met with Respondent Haughey and discussed the timeline projecting the public stock offering to occur in June. Following the meeting, Respondents agreed to provide legal services to Appellant in relation to the public offering, but their agreement made no mention of the timeline. Respondents did provide the services, but Appellant's public offering did not occur until September 2008. By that time, the oil market had crashed, and Appellant's offering failed.

In 2012, Appellant filed suit against Respondents alleging legal malpractice, breach of contract, breach of fiduciary duty, and fraud. During discovery, Appellant disclosed the damages calculations of its expert, Charles Brettell. Brettell calculated consequential damages based on a "market cap" theory, which Appellant describes as "the lost market value . . . of the company flowing from the failed securities offering." Brettell's calculation ultimately valued Appellant's "market cap" or "enterprise value" between $202,339,588 and $358,421,781.

In 2013, Respondents filed a motion for partial summary judgment on Appellant's consequential damages theory. In their motion, Respondents asserted that Appellant could not recover any consequential damages because Appellant's expert calculated the damages as to Appellant's shareholders, not to Appellant as a corporation. Respondents further averred that Appellant's damages calculation is inherently speculative in that it assumes lost profits when Appellant, as a company, has no history of prior profitability.

Appellant opposed the motion. In doing so, Appellant contended that its expert calculated the market loss sustained by Appellant as a corporation as a result of the failed offering, not any damages suffered by its shareholders. Appellant further asserted that, despite its history of "negative cash flow," it was "an established business" that was "increasing in value." Thus, Appellant contended that Brettell's damages calculations were not inherently speculative.

On October 3, 2013, the trial court entered partial summary judgment in favor of Respondents. In its judgment, the trial court determined that "it is undisputed that [Appellant] was never profitable prior to the 2008 proposed stock offering and therefore cannot recover lost profits because the projection is inherently speculative." The trial court further determined that Brettell "quantified the alleged damages of [Appellant] based on the projected value of shares of stock held by EnerJex stockholders who are not parties to this case." Thus, the trial court granted Respondents' motion for partial summary judgment on Appellant's consequential damages theory.

Respondents then filed several motions *in limine* to exclude expert opinion and Appellant's "stock sale theory" of damages from trial. The trial court subsequently

3

granted the motions and excluded "any evidence relating to the loss of $25 million in damages because of the cancelled stock offering" from trial.

On January 2, 2014, Appellant voluntarily dismissed its fraud, fee disgorgement, and punitive damages claims after reaching a partial settlement agreement with Respondents. Respondents then requested the trial court grant summary judgment in their favor on Appellant's remaining claims of legal malpractice, breach of contract, and breach of fiduciary duty because, based upon the trial court's previous rulings, Appellant could not establish damages. On January 6, 2014, the trial court entered its final judgment in which it granted summary judgment in favor of Respondents "based on the absence of any recoverable actual damages."

Appellant now raises two points of error on appeal. Before we can address those points, however, we must first take up Respondents' motion to dismiss this appeal. In their motion, Respondents contend that Appellant lacks standing to bring this appeal because Appellant assigned its claims against Respondents to Appellant's shareholders when, as part of a merger deal, Appellant declared a special dividend equal to Appellant's "Net Recovery" in this case. Appellant opposes the motion, contending that the declaration of the special dividend to pre-merger stockholders does not constitute an assignment in that Appellant remains in complete control of the litigation and will receive and control all proceeds recovered from the lawsuit.

In September 2013, Appellant merged with Black Raven, Inc. As part of the merger agreement, Appellant created a special stock dividend for its pre-merger stockholders. The provision provides:

> [Appellant] may declare a dividend payable to [Pre-merger EnerJex stockholders], under which [Appellant] will issue such stockholders shares

4

of stock . . . entitling such stockholders to receive in the aggregate a number of shares of [Appellant] Common Stock equal to the quotient determined by dividing (x) [Appellant's] "Net Recovery" in the [Husch] litigation, by (y) $0.70.[1]

The term "Net Recovery" is defined as:

[T]he gross amount received by [Appellant] in settlement of its claim in the [Husch] litigation or in satisfaction of any judgment entered in favor of [Appellant] . . . reduced by litigation expenses and the portion of such gross amount that [Appellant] is obligated to pay to counsel representing [Appellant] in the [Husch] litigation.

Although the merger and declaration of the special dividend occurred prior to the trial court's final grant of summary judgment, Respondents did not raise this issue before the trial court.

At the outset, we note that assignment of legal malpractice claims is against Missouri public policy. *VinStickers, LLC v. Stinson Morrison Hecker*, 369 S.W.3d 764, 767 (Mo. App. W.D. 2012). Moreover, some Missouri courts have found that the assignment of the *proceeds* from a personal injury claim is no different from the assignment of a personal injury *claim*. *See Schweiss v. Sisters of Mercy, St. Louis, Inc.*, 950 S.W.2d 537, 538 (Mo. App. E.D. 1997); *see also Hays v. Mo. Highways & Transp. Comm'n*, 62 S.W.3d 538, 542 (Mo. App. W.D. 2001) (recognizing the holding in *Schweiss* that the difference between assignment of a claim and assignment of the potential proceeds of a personal injury claim is a distinction without a difference). However, under the present set of circumstances, we cannot say an assignment of Appellant's legal malpractice claim or the proceeds therefrom occurred as a result of Appellant's declaration of the special dividend.

---

[1] According to Appellant, the dividend is contingent upon Appellant realizing a recovery from the lawsuit prior to December 31, 2014.

5

Respondents contend that Appellant's declaration of this special dividend to its pre-merger shareholders constitutes an assignment of Appellant's legal malpractice claim because any damages Appellant receives from the lawsuit will be given to the pre-merger shareholders, thus evidencing Appellant's intent to assign its legal malpractice claim to the pre-merger shareholders. In doing so, Respondents emphasize that "no particular form of words is necessary to accomplish an assignment, so long as there appears from the circumstances an intention on the one side to assign and on the other side to receive." *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 125 (Mo. banc 2010).

However, "assignment occurs only when one party transfers to another all or part of one's property, interest, or rights." *Hagar v. Wright Tire & Appliance, Inc.*, 33 S.W.3d 605, 610 (Mo. App. W.D. 2000) (internal quotation omitted). Assignment "divests the assignor of all interest in the thing assigned, and vests the same in the assignee." *Schaffer v. Bd. of Educ. of City of St. Louis*, 869 S.W.2d 163, 168 (Mo. App. E.D. 1993) (internal quotations omitted).

Here, the special dividend does not divest Appellant of its interest in the proceeds of the lawsuit. Any damages awarded to Appellant would remain with the corporation. Furthermore, not all the damages recovered from the lawsuit would be converted into stock shares. Rather, based on the definition of "Net Recovery," Appellant would first pay off its litigation expenses and attorneys' fees from the damages recovered in the lawsuit. Therefore, because the special dividend does not divest Appellant of its interest in the lawsuit, no assignment occurred. Accordingly, Respondents' motion to dismiss this appeal is denied.

6

We now address Appellant's points on appeal. In its first point, Appellant contends that the trial court erred in granting summary judgment in favor of Respondents. We review grants of summary judgment *de novo*. ***Cent. Trust & Inv. Co. v. Signalpoint Asset Mgmt., LLC***, 422 S.W.3d 312, 319 (Mo. banc 2014) (citing ***ITT commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.***, 854 S.W.2d 371, 376 (Mo. banc 1993)). We view the evidence and all reasonable inferences therefrom in the light most favorable to the party against whom summary judgment was entered. ***Id.*** at 320. "However, facts contained in affidavits or otherwise in support of the party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion." ***Id.*** (internal quotation omitted).

"Summary judgment is only proper if the moving party established that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law." ***Id.*** at 319 (internal quotation omitted). A defending party is entitled to summary judgment upon establishing one of the following:

> (1) facts negating any one of the elements of the non-movant's claim; (2) that the non-movant, after an adequate period for discovery, has not been able and will not be able to produce sufficient evidence to allow the trier of fact to find the existence of any one of the elements of the non-movant's claim; or (3) that there is no genuine dispute as to the existence of the facts necessary to support movant's properly pleaded affirmative defense."

***Id.*** at 319-20 (internal quotation omitted). "Summary judgment . . . can be affirmed on appeal by any appropriate theory supported by the record." ***Roberts v. BJC Health Sys.***, 391 S.W.3d 433, 437 (Mo. banc 2013).

Appellant asserts that the trial court erred in granting summary judgment on the basis that Appellant could not recover under its consequential damages theory because

7

Appellant had no history of profitability. The trial court determined that all of Brettell's damages calculations necessarily include a lost profits component. It further concluded that, because Appellant had reported net losses every year since Appellant's inception, Appellant failed to establish a history of prior profitability and, thus, could not recover damages that included lost profits.

Under Missouri law, lost or anticipated profits of a commercial business are generally deemed "too remote, speculative, and too dependent upon changing circumstances to warrant a judgment for their recovery." *Anderson v. Abernathy*, 339 S.W.2d 817, 824 (Mo. 1960) (internal quotation omitted). Lost profits "may be recovered only when they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount." *Id.* "[P]roof of the income and expenses of the business for a reasonable time anterior to its interruption, with a consequent establishing of the net profits during the previous period, is indispensable." *Coonis v. Rogers*, 429 S.W.2d 709, 714 (Mo. 1968). Thus, "[w]ith no history of profitability, [a p]laintiff cannot present sufficient evidence to prove lost profits from an existing commercial business." *Midwest Coal, LLC ex rel. Stanton v. Cabanas*, 378 S.W.3d 367, 370 (Mo. App. E.D. 2013).

Appellant does not contest that Brettell's calculations include a lost profits component. Instead, Appellant contends that it does not need to establish prior profitability in order to recover under its damages theory because it is alleging damages flowing directly from a specific transaction – namely the failed public stock offering. As explained in *BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179, 195 (Mo. App. E.D. 2007), the general rule that a plaintiff must establish a history of profitability to recover lost

8

profit damages "applies in cases where the loss of expected profits flows from the destruction or injury to a business." However, "[w]hen a plaintiff sues for damages arising directly out of a breach of contract, he or she need not prove past profits or expenses." *Id.* Thus, a plaintiff may seek lost profits arising from a breach of contract without proof of prior profitability "where loss is ascertainable with reasonable certainty from the breach and the profits claimed are not speculative or conjectural and were within the contemplation of the parties when the contract was made." *Id.* (internal quotation omitted).

Although Appellant avers that the "lost proceeds" in its damages calculation are tied to a specific transaction, Brettell's damages model includes lost profits resulting from transactions far removed from the public offering. In determining Appellant's "market cap," Brettell's model assumes that Appellant would have used the $25 million (less $3 million to pay preexisting debt) to acquire new oil field leases and drill new wells to expand its oil production. Brettell then assumes that those expansions and acquisitions would have generated a profit that would then allow Appellant to receive additional financing from lenders. Appellant would then use those additional loans combined with the assumed profits from the expansions and acquisitions to make further acquisitions and expansions that would, in turn, generate further profit. Thus, the lost profits component of Brettell's calculations did not flow directly from any specific contract or transaction. Rather, they flowed from projected loans, expansions, and acquisitions that Brettell assumed Appellant would be successful in obtaining and securing over the course of the two-year period following the public offering. Without

9

any evidence of a prior history of profitability of engaging in similar business dealings, Brettell's assumed lost profit figures are inherently speculative.

Likewise, Appellant cannot rely upon the "specific transaction" standard or exception to claim $25 million in lost profits from the failed public offering.[2]  As explained by the Eastern District, recovery of lost profits without evidence of prior profitability has been permitted where a plaintiff "recovered its loss of profits flowing directly from a breach of or interference with a specific contract."  *Midwest Coal,*, 378 S.W.3d at 371.  Proof of income and expenses for a reasonable anterior period has not been required in such cases only because "(1) the evidence clearly established the fact of damages; and (2) the amount of damages was readily ascertainable since [the] cases involved products for which profits were calculable based on past and future sales of the same items."  *Id.*  The cases permitting recovery of lost profits without evidence of prior profitability all "involved known commodities with demonstrable market prices."  *Id.* at 372.

Here, the contract allegedly breached was one in which Respondents agreed to provide Appellant with legal services.  Thus, the contract at issue does not involve a product for which profits were readily calculable based on past and future sales of an item.  Therefore, while a breach of contract is alleged in this case, Appellant is not seeking lost profits on the contract itself.  Instead, Appellant is seeking the $25 million it believed it would receive in stock sale proceeds as the injury to its business after

---

[2] To the extent Appellant is claiming direct damages from the failed public stock offering, we note that "[u]nissued stock has no value to the corporation, because stock only represents portions of equity in the corporation itself." **18 C.J.S. Corporations** § 203 (2007); *see also* **I.R.C. § 1032(a)** ("No gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation.").

Respondents' alleged malpractice and breach of fiduciary duties. *See* **Harvey v. Timber Res., Inc.**, 37 S.W.3d 814, 818 (Mo. App. E.D. 2001) (explaining that proof of prior income and expenses was necessary in a case where a business alleged lost profits as a result of a breach of a noncompete clause). Under such circumstances, proof of prior profitability is necessary as Appellant is not seeking lost profits directly flowing from a breach of or interference with a specific contract.

Thus, as found by the trial court, Appellant's alleged damages include lost profit components even though Appellant failed to establish a history of profitability prior to the public offering.[3] Therefore, the trial court did not err in granting summary judgment on the basis that Appellant could not establish damages because its alleged damages based on lost profits are inherently speculative.

Judgment affirmed.[4]

_____
Joseph M. Ellis, Judge

All concur.

---

[3] Appellant also contends that whether it was profitable prior to the public stock offering constitutes an issue of material fact improperly decided by the trial court. However, in their motion for summary judgment, Respondents offered Appellant's SEC filings to establish that Appellant had reported net losses since its inception in 2006. Appellant offered no evidence in its opposition to the summary judgment motion to contradict that fact. Rather, Appellant alleged only that it had been "successful." Now on appeal, Appellant contends that whether it was profitable is a factual issue because there was evidence in the record that its stock has been actively traded in a public market since 2006, a Husch attorney considered its stock a good investment, it was able to obtain the $25 million financing necessary for the public offering, and all parties associated with the public offering were confident the stock would sell easily. Such facts, however, do nothing to contradict the fact that, prior to the public offering, Appellant had never reported a net profit. Thus, Appellant's contention that a factual dispute exists as to its history of profitability is without merit.

[4] Due to our disposition of Appellant's first point, we need not address Appellant's remaining points and contentions on appeal.