**Eddie L. MAUPIN, Appellant,**

v.

**HALLMARK CARDS, INC., Respondent.**

**No. WD 48987.**

Missouri Court of Appeals,
Western District.

Feb. 14, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 28, 1995.

Kelly Lee McClelland, Liberty, for appellant.

Paul E. Donnelly, Kansas City, for respondent.

Before KENNEDY, P.J., and BRECKENRIDGE and SPINDEN, JJ.

KENNEDY, Presiding Judge.

Plaintiff Eddie L. Maupin sued his former employer, Hallmark Cards, Incorporated, for damages for Hallmark's alleged breach of a settlement agreement, by which Hallmark and Maupin settled certain pending claims asserted by Maupin against Hallmark, growing out of Maupin's employment by Hallmark. The claims which were settled are described in the settlement agreement as follows: "[C]omplaints of age discrimination and retaliation regarding his employment."

Maupin claims Hallmark breached the settlement agreement in denying him certain retirement benefits, and in excluding him from consideration in his post-resignation business of buying and selling used and surplus office supplies, furnishings and equipment. He also claims he was induced to enter into the settlement agreement by Hallmark's false and fraudulent misrepresentations that he would receive the retirement benefits and that he would have access to Hallmark's used and surplus office supplies, furnishings and equipment.

Maupin appeals from a summary judgment in Hallmark's favor on all counts of his petition.

Maupin was employed by Hallmark continuously from 1955 until 1988, with a two-year interruption for military service. He was still employed by Hallmark when he asserted the claims described in the preceding paragraph, and which were resolved by the settlement agreement mentioned above. The settlement agreement was dated February 18, 1988. As a part of his agreement, Maupin agreed to resign his employment by Hallmark on February 29, 1988. The agreement recited that Maupin's "job assignment and responsibilities" had ended January 29, 1988. Maupin at this time was 52 years of age. Under the terms of Hallmark's retirement plan, the earliest age at which an employee could retire and be entitled to retirement benefits was 55.

## BREACH OF CONTRACT TO FURNISH RETIREMENT PLANS BENEFITS

Maupin's petition claims that Hallmark was obligated to pay to him, when he reached age 55, a retirement stipend of $330 per month. This pension, Maupin claimed, was provided by "Hallmark's Career Rewards Benefit Plans," to which reference was made in the settlement agreement. "Hallmark's Career Rewards Benefit Plans" are referred to twice in the agreement. In Paragraph 4, the agreement says:

4. Hallmark agrees to continue Maupin's benefits under the Hallmark Career Benefit Plans (including the Thrift and Profit Sharing Plans) through February 29, 1988, except as provided in paragraph 7 hereinbelow....

In Paragraph 10, the agreement says:

10. Maupin acknowledges that after February 29, 1988 he shall no longer be an employee of Hallmark and that he is not entitled to any further wages, payments or benefits accorded to Hallmark employees, *beyond those specifically provided for herein or under the terms of Hallmark's Career Rewards Benefit Plans.*

We have underlined the language stressed by Maupin.

Hallmark's "Career Rewards Benefit Plans" describe certain retirement benefits available to retired Hallmark employees, including the $330–per–month pension which Maupin is claiming. There is no argument but that these plans come within the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1001 et seq. (1985).

Hallmark argues that Maupin's claim for the $330–per–month pension is preempted by ERISA, and that Maupin's exclusive remedy is that provided by ERISA. 29 U.S.C.A. § 1144(a) provides that ERISA (insofar as applicable here) "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." Section 1144(c)(1) says: "The term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State."

Hallmark, defending its summary judgment, argues, with respect to Maupin's claim for breach of contract and for fraud in denying the retirement benefits, that ERISA has preempted state law, and ERISA provides Maupin's only remedy.[1] Maupin argues the contrary, *i.e.*, that ERISA has not preempted his common law cause of action.

Both parties assume that if ERISA has preempted state law, including Maupin's common law claim and remedy, then Hallmark is entitled to summary dismissal of Maupin's claim for denial of the retirement benefits, and summary judgment in Hallmark's favor on that part of his claim.

This is not the case. Even though ERISA may have preempted state law with respect to Maupin's claim for denial of retirement benefits, "[s]tate courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section." 29 U.S.C.A. 1132(e)(1). Subsection (a)(1)(B) says: "A civil action may be brought (1) by a participant or beneficiary ... (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan...."

■ The fact of ERISA preemption, if true, does not defeat Maupin's claim. The state court would have jurisdiction of the case. *State ex rel. Montgomery Ward & Co., Inc. v. Peters,* 636 S.W.2d 99 (Mo.App.1982). The fact of ERISA pre-emption would mean only that the trial court would apply federal law as embodied in ERISA. *See, In re Estate of Carroll,* 857 S.W.2d 848, 857 (Mo.App. 1993); *Montner v. Interfaith Medical Ctr.,* 157 Misc.2d 583, 596 N.Y.S.2d 975, 981 (N.Y. City Civ.Ct.1993); *Rodriguez v. Travelers Ins. Co.,* 54 Wash.App. 725, 775 P.2d 973, 975 (1989). (Contra: *O'Brien v. Great Lakes Container Corp.,* 748 S.W.2d 412 (Mo.App. 1988). That case held that the state court

had no subject matter jurisdiction of a claim for benefits under ERISA. This holding was based upon a misunderstanding of our case of *Hagler v. J.F. Jelenko & Co.,* 719 S.W.2d 486 (Mo.App.1986). *O'Brien* seems to have overlooked 29 U.S.C.A. 1132(e)(1). The case is not in harmony with other cases on the topic.)

Hallmark does not argue that it is entitled to summary judgment on the ground that ERISA furnishes it a matter-of-law defense to Maupin's claims for retirement benefits. It is therefore not necessary for us to decide the issue of preemption.

## CLAIM FOR RETIREMENT BENEFITS (BREACH OF CONTRACT)

Hallmark then says, ERISA aside, that the very terms of the settlement agreement (including the terms of Hallmark's Career Rewards Benefit Plans, which were specifically incorporated into the settlement agreement), unambiguously foreclose Maupin's retirement benefit claim, and it is therefore entitled to summary judgment.

■ If the contract is unambiguous, its meaning is declared by the court as a matter of law. *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club,* 491 S.W.2d 261, 264 (Mo. banc 1973).

■ Maupin began receiving early retirement benefits from the Hallmark Retirement Plan when he reached the age of 55.[2] He claims that he was entitled, not only to the benefits from the Hallmark Retirement Plan, but also to supplemental retirement benefits of $330 per month, in accordance with the terms of a temporary supplemental retirement program which was in effect from December 31, 1987 to July 31, 1988. This temporary supplemental plan provided that an employee under the age of 62 could elect to retire in 1988, before July 31, and receive a supplement of $10 per month for each year's

---

**1.** Cases cited by Hallmark about the fact and the scope of ERISA pre-emption of state law are the following: *Coonce v. Aetna Life Ins. Co.,* 777 F.Supp. 759 (W.D.Mo.1991); *Enlow v. Fire Protection Systems, Inc.,* 803 S.W.2d 148 (Mo.App. 1991); *O'Brien v. Great Lakes Container Corp.,* 748 S.W.2d 412 (Mo.App.1988); *Anderson v.*

*John Morrell & Co.,* 830 F.2d 872 (8th Cir.1987); *Bohlmann v. Logos School,* 669 F.Supp. 951 (E.D.Mo.1987).

**2.** These were evidently vested benefits, provided by Hallmark's "Thrift and Profit Sharing Plan."

service. This benefit would continue until the retiree was first eligible for old-age benefits under the Social Security Act. In Maupin's case, having served 33 years, this supplemental benefit would amount to $330 per month.

The plan nowhere provides for an employee's retirement before age 55. The settlement agreement specifically calls for Maupin's resignation as of February 29, 1988, when Maupin was 52. He did not "retire" during the seven-month 1988 window, which would have entitled him to the supplementary retirement benefits. For one thing, his agreement called for his resignation, not his retirement. Secondly, he was not old enough to retire. By the time he had reached the minimum retirement age of 55, the 1988 window was closed; he was no longer an employee, and he could not elect to retire.

Maupin claims also that he has been denied other Hallmark retirement benefits which he is entitled to under the settlement agreement. These are an employee discount card for use in Hallmark's stores; participation in Hallmark's 25–Year Club and Retirement Club; and receiving certain Hallmark employee publications. None of these are included in the settlement agreement or in the retirement plan documents referred to in the settlement agreement. Maupin has no contractual claim upon these benefits, and summary judgment is proper with respect to them.

■ Maupin also claims he was entitled to have retiree's coverage under Hallmark's medical and dental insurance plans upon reaching age 55, upon the same terms and conditions as any other former Hallmark employee. Hallmark was entitled to summary judgment on this claim. In correspondence between Maupin's and Hallmark's attorneys in the negotiation of the settlement agreement, it was expressly pointed out to Maupin that the Hallmark's medical and dental insurance plans for retirees, contrary to an earlier understanding between the parties, would not be available to Maupin. Because of that, the cash payment from Hallmark to Maupin was increased from $60,000 to $110,000. This is substantiated by affidavits and copies of correspondence filed by Hallmark in support of its motion for summary judgment, and has not been denied by Maupin.

In withholding the retirement benefits Maupin claims he is entitled to, Hallmark has not breached the settlement agreement between itself and Maupin. The court correctly rendered summary judgment in Hallmark's favor in Maupin's claim for breach of contract in withholding retirement benefits.

## CLAIM FOR RETIREMENT BENEFITS (FRAUD CLAIM)

Maupin alleges in the fraud count of his petition: "Defendant represented to plaintiff at the time the parties were entering into a settlement contract that plaintiff would receive the same benefits as other employees retiring the same time as plaintiff. . . . Defendant's representatives specifically told plaintiff prior to entering into the Settlement Agreement that he would be eligible to receive an additional Ten ($10.00) Dollars per month for every year of service with defendant under the provisions of Defendant's early retirement program in effect in 1988, that he would be eligible for health insurance, his discount card and membership in defendant's retirement club and 25 Year Club. . . . Defendant's representations, all as aforesaid, in the presence of plaintiff were either false when made, or where made with conscious disregard for the truth or falsity of said statements, as evidenced by defendant's nearly immediate refusal to honor these representations. Defendant's representations, all as aforesaid, were made with the intent to induce plaintiff to enter into a binding settlement contract and to release his legitimate claims of discrimination against defendant."

■ Hallmark was entitled to summary judgment on this claim. Maupin's entitlement to such retirement benefits (as we pointed out in our discussion of the breach of contract claim for retirement benefits) was expressly addressed in the negotiations leading up to the settlement agreement, and were negotiated out of the settlement agreement. Maupin cannot say that he relied upon Hallmark's allegedly fraudulent misrepresentation that he would receive the retirement benefits in signing the settlement

agreement. It is an essential part of a plaintiff's fraudulent misrepresentation case that plaintiff relied upon the alleged fraudulent representation to his damage. *Clark v. Olson,* 726 S.W.2d 718, 719 (Mo. banc 1987). The absence of such reliance on Maupin's part is clear from the record. *See Charles Woods Television Corp. v. Capital Cities/ABC, Inc.,* 869 F.2d 1155, 1161 (8th Cir.), *cert. denied,* 493 U.S. 848, 110 S.Ct. 145, 107 L.Ed.2d 104 (1989).

■ Maupin attempts to create a fact issue by filing a counter-affidavit in which he says: "That I was told by my benefits representative I would be treated like other retiring Hallmark employees for purposes of retirement benefits, my discount card, defendant's 25 Year Club and defendant's retirement club; that I specifically told my representative that I was supposed to receive an early retirement bonus under which I would receive an additional $10.00 per month per year of service for early retirement. My representative agreed that I would receive this upon reaching age 55; that I entered into my settlement agreement with the understanding that I would be treated the same as other retiring employees upon reaching age 55."

Silent as to time, silent as to identity of the speaker, and silent as to the speaker's authority or apparent authority to bind Hallmark, Maupin's affidavit will not serve to counter the specific, detailed and documented support of Hallmark's denial of Maupin's fraudulent misrepresentation claim, and its application for summary judgment. " 'Genuine (issues of material fact)' implies that the issue in dispute, must be a real and substantial one—one consisting not merely of conjecture, theory and possibilities." *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 378 (Mo. banc 1993). Hallmark's entitlement to summary judgment on Maupin's fraud claim is clear, insofar as it asserts fraud with respect to the retirement benefits.

### BREACH OF CONTRACT TO ALLOW "APPROACH" FOR BUYING AND SELLING GOODS

We turn to Maupin's claim for damages for Hallmark's alleged refusal to deal with him after he had resigned and had entered the business of representing others in the purchase and sale of used and surplus equipment. Maupin says the evidence before the court on the motion for summary judgment did not resolve all fact issues under the standards of *ITT Commercial Finance Corp.,* so as to justify the grant of summary judgment against his claim and in favor of Hallmark.

The settlement agreement provided for Maupin's resignation from Hallmark. Maupin's employment with Hallmark had been involved in the disposition of Hallmark's obsolete and surplus office equipment, and he had the title of "Surplus Controller." He had in mind going into the business of brokering or of buying and selling used office equipment and supplies after leaving Hallmark's employ. As a part of the settlement agreement, Hallmark furnished Maupin a letter, addressed "To Whom It May Concern." The final sentence of the letter was this: "We wish (Mr. Maupin) success in his new business ventures and he is certainly welcome to approach Hallmark as a representative of vendors and/or buyers in the future." The contents of the letter were negotiated between the parties, including the just-quoted sentence. Both parties were represented by counsel in the negotiations.

Hallmark, defending its summary judgment, says, first, that the quoted sentence from the letter did not constitute a contractual obligation of Hallmark to Maupin. Hallmark was obliged by the contract to furnish the letter for Maupin's use, it says, but it was not obliged to Maupin to comply with the letter's terms.

■ This argument has a hollow sound. Hallmark may not be held as a matter of law to have put into the letter an assurance to Maupin's clients that it would not discriminate against them because they were represented by Maupin, then later claim it did not mean what it had said. Of course, a contract need not be embodied in a single writing; it may include other documents either by express reference or clear implication. *Sales Service, Inc. v. Daewoo Int'l. (America) Corp.,* 770 S.W.2d 453 (Mo.App.1989). The

"To Whom it may Concern" letter was expressly referred to in the basic contract, and was required by it.

Second, Hallmark says the letter's assurance that Maupin was "welcome to approach" Hallmark as a representative of vendors and/or buyers in the future, was too vague and uncertain to be enforceable. No contract comes into existence if the terms of the supposed contract are unduly uncertain and indefinite. *Around the World Importing, Inc. v. Mercantile Trust Co., N.A.*, 795 S.W.2d 85, 90 (Mo.App.1990). On the other hand, when the parties have written down an agreement in terms to which they both have acceded, the courts are reluctant to hold the agreement ineffectual for indefiniteness. Especially is that true when the other party has performed his part of the agreement and has, in a manner of speaking, burned his bridges behind him. 17A Am.Jur.2d Contracts § 193 (1991). The rule which is applicable to the case before us is thus stated in *Busching v. Griffin*, 542 So.2d 860, 863 (Miss.1989):

> Determination that an agreement is sufficiently definite is favored in the courts, so as to carry out the reasonable intention of the parties if it can be ascertained. A contract is sufficiently definite if it contains matter which would enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if necessary relevant extrinsic evidence. Having found a contract to have been made, an agreement should not be frustrated where it is possible to reach a reasonable and fair result.

See also 1 Corbin on Contracts, § 4.1 (1993); 17A Am.Jur.2d Contracts § 193 (1991). With these teachings in mind, we hold as follows:

Hallmark's promise that Maupin would be welcome to approach Hallmark was not so vague and indefinite as to make it unenforceable. The letter could be found to constitute a promise on Hallmark's part not to exclude Maupin from dealings with Hallmark in behalf of Maupin's clients. It must be borne in mind that Maupin, by the contract with Hallmark, was agreeing to resign his employment and to dismiss his various claims against Hallmark. The parties contemplated that Maupin would enter the business of brokering the kind of assets Hallmark was continually selling. Should Hallmark blacklist Maupin, Maupin would be excluded from a significant source of business. Of course, any prospective purchaser or seller of business furnishings, equipment and supplies who hoped to do have access to Hallmark, would avoid representation by Maupin. It was important to Maupin to be assured himself, and to be able to assure prospective clients, that Hallmark would not discriminate against him.[3]

Hallmark then says it is entitled to summary judgment on the "refusal to allow approach" claim, because all the evidence before the court on the motion for summary judgment was that Hallmark had actually allowed Maupin to "approach" it in behalf of his clients, and that it had actually done business with him in his clients' behalf. Hallmark says Maupin has brought forward no evidence to the contrary. So, according to its argument, even if the "welcome to approach" language created a contractual obligation on its part, it had fulfilled that obligation. Therefore, Hallmark says, there was no fact issue left unresolved by the evidence and pleadings before the court, and, by the teaching of *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371 (Mo. banc 1993), Hallmark was entitled to summary judgment on this count.

Maupin, however, in response to Hallmark's motion for summary judgment, presented evidence that Hallmark's agents and employees did, in fact, purposefully reject Maupin's attempts to deal with Hallmark. He filed his own affidavit that, in September, 1988, representing Mid–America Shelving and Sales Co., he made an oral

---

3. Hallmark does not argue the uncertainty of duration of the alleged promise as a feature which would invalidate the same. It does argue, infra, in connection with the fraud claim, citing *Wilson v. Westinghouse Elec. Corp.*, 838 F.2d 286 (8th Cir.1988), that Maupin could not reasonably rely on such a nebulous representation as he claims, the uncertainty of duration being a part of its vagueness.

agreement with a named Hallmark employee "for the sale of over $1.7 million in goods." The Hallmark employee returned to his office to write up the agreement, then called Maupin—after Maupin had lined up buyers for the goods—and cancelled the agreement. He gave the explanation that "Hallmark management did not wish to use (Maupin)." Hallmark's representatives would rarely take or return his calls. Mid–America got only "token business" from Hallmark. Maupin filed the affidavit of a retired Hallmark employee who, while employed by Hallmark, was told "not to give any business to Ed Maupin," and that "Ed Maupin should not be allowed to come back to Hallmark as a representative of vendors seeking to contract with Hallmark."

The evidence submitted by Maupin was sufficient to make a fact issue. Rule 74.04(c). Summary judgment for Hallmark on plaintiff's claim for damages for Hallmark's alleged breach of its contract in its refusal to entertain plaintiff's offers to deal with Hallmark, as contemplated by the settlement agreement and the incorporated letter, is reversed.

## TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY

Count II of Maupin's petition asserts a claim against Hallmark for tortious interference with a business expectancy. This claim is based upon Hallmark's alleged declination to deal with Maupin as a representative of Mid–America Shelving, Inc. Maupin emphasizes the incident described earlier, in which a Hallmark employee orally agreed to sell Mid–America Shelving, through Maupin, a $1.7 million quantity of goods, then, after Maupin had contacted buyers for the goods, reneged on the sale.

■ The facts outlined above do not make out a prima facie case of tortious interference with a business expectancy. The elements of a cause of action for tortious interference with a business expectancy are the following: (1) a contract or a valid business relationship or expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of con-

tract or relationship; and (4) damages resulting from defendant's conduct. *Meyer v. Enoch,* 807 S.W.2d 156, 159 (Mo.App.1991).

■ Maupin cites us to no case where the intentional interference by the defendant consisted of a refusal to enter into a contract with the plaintiff or the plaintiff's principal, or a refusal to entertain an offer from plaintiff or plaintiff's principal. In such a case, the operative rule would be that the defendant had the absolute discretion to deal with plaintiff or with plaintiff's principal, or not to deal with them. *International Plastics Dev., Inc. v. Monsanto Co.,* 433 S.W.2d 291 (Mo. banc 1968).

If, as Maupin claims, Hallmark had a duty to deal with him and his principals on a nondiscriminatory basis, that duty came only from the contract between Hallmark and Maupin; it was not a duty imposed by law, remediable as a tort.

Plaintiff Maupin has no cause of action against Hallmark for tortious interference with a business expectancy. His remedy, if any, is for Hallmark's breach of contract. The trial court was correct in rendering summary judgment in Hallmark's favor and against plaintiff on Count II of plaintiff's petition.

## CLAIM OF FRAUD ("WELCOME TO APPROACH")

■ Hallmark makes no attempt to justify the summary judgment on Maupin's fraud claim with respect to its "welcome to approach" promise, other than the justification it offers for summary judgment on the breach of contract claim, namely, that it made no binding promise to allow Maupin's approach, and, if it did make such a binding promise, it had performed the same. We have disposed of those arguments adversely to Hallmark, holding that summary judgment should not have been granted on the breach of contract claim.

■ We hold that summary judgment should not have been granted on this aspect of the fraud claim. Hallmark has not supported its application for summary judgment on this feature. Of course, Maupin would

have to prove, in order to establish a fraud claim, not only that Hallmark had breached its contract, but that it intended to do so when it made the contract. Otherwise, it would be merely promissory. *Kawin v. Chrysler Corp.*, 636 S.W.2d 40, 43 (Mo. banc 1982).

## CONCLUSION

Judgment for Hallmark is affirmed insofar as it denies plaintiff's claims for breach of contract and for fraud in Hallmark's alleged denial of retirement benefits to plaintiff, and insofar as it denies plaintiff's claim for tortious interference with a business expectancy.

Insofar as plaintiff's petition claims damages for breach of contract and for fraud in the denial of non-discriminatory access to Hallmark for the purchase of property, the judgment is reversed and the case is remanded to the trial court for further proceedings.

All concur.