**PROPERTY ASSESSMENT REVIEW, INC., Appellant,**

v.

**GREATER MISSOURI BUILDERS, INC., Respondent.**

No. ED 89826.

Missouri Court of Appeals, Eastern District, Division Three.

July 15, 2008.

Patrick W. Keefe, Ellisville, MO, for appellant.

Todd J. West, Stephen C. Hiotis, Clayton, MO, for respondent.

## *OPINION*

GLENN A. NORTON, Judge.

Property Assessment Review ("PAR") appeals the judgment entered after a bench trial in which the trial court found in favor of defendant Greater Missouri Builders, Inc. ("GMB") on PAR's claim for breach of contract. We reverse and remand.

### I. BACKGROUND

PAR is a Missouri corporation which is engaged in the business of evaluating and appealing the assessed values of its clients' real property. GMB is a Missouri corporation which owns and manages numerous

commercial properties. On March 25, 1998, PAR and GMB executed a Standard Real Property Tax Consulting Agreement (the "1998 Contract"). The 1998 Contract "appointed" PAR:

[T]o evaluate the current assessed valuations and to use its best efforts to obtain a reduction in such real estate tax assessments that PAR determines to be excessive for the calendar year 1998 *and thereafter* (the "Tax Years") of *all real properties* owned, managed or controlled by [GMB], the names or locations of which we *will hereafter provide* to PAR, *including without limitation,* the following (collectively, the "Properties"): 2187 First Capital Dr., St. Charles, MO.

(emphasis added). The 1998 Contract contained the following provisions outlining GMB's obligations:

We, the undersigned, hereby appoint PAR as our sole and exclusive agent to negotiate such reductions and to file such appeals and protests for the Tax Years....

We understand that PAR will undertake to obtain such reductions on a contingency basis without charge for its time and expenses. If PAR is unsuccessful in its efforts, no fee or commission will be charged. But if the assessed valuation of any of the Properties is reduced for any of the tax years following the date hereof, we agree to pay PAR a commission equal to thirty three and one-third per cent (33.33%) of the tax savings for each Tax Year appealed and for the immediately following year....

If we terminate this agreement, we will nevertheless pay the agreed commission provided above for *any of the properties* for which PAR has initiated efforts to reduce the assessment or has been authorized to do so during the year in which the termination occurs without regard to PAR's responsibility for obtaining a tax reduction following the termination of its services. If we fail to pay the commission when due, we will pay interest on the amount owed at the rate of 1 1/2% per month. If PAR employs a lawyer to collect its commission from us, we will pay all its costs in so doing including a reasonable attorney's fee based on the normal hourly rate or fee of such attorney and the time expended by him or her, without regard to the amount involved.

(emphasis added).

PAR filed an appeal with the St. Charles County assessor's office to dispute the assessed value of 2187 First Capital Drive. PAR was successful in obtaining a reduction in the property's assessed value for the 1998 tax year. PAR invoiced GMB, and GMB paid PAR's commission pursuant to the terms of the 1998 Contract. Thereafter, GMB asked PAR to evaluate another property located at 1355 South 5th Street, St. Charles, Missouri (the "St. Charles Center Property"). There was testimony at trial that Bill Bitting, a sales associate for PAR, sent a new Standard Real Property Tax Consulting Agreement form to Dan Barnard at GMB, which specifically referenced the St. Charles Center Property. The testimony, however, showed that Bitting sent this document to GMB to ensure that he would be the PAR salesperson that collected any commission paid for the St. Charles Center Property. Regardless, the agreement naming the St. Charles Center Property was never executed. In fact, the record is devoid of an executed agreement naming the St. Charles Center Property, or any property other than the 2187 First Capital Drive property named in the 1998 Contract. PAR again appealed to the county assessor's office and was successful in obtaining a reduction in the assessed value of the St. Charles Center Property. Despite the ab-

sence of an executed agreement specifically naming such property, GMB paid PAR a commission of 33.33% of the tax savings on the property consistent with the terms of the 1998 Contract.

In 2002, GMB instructed PAR to file another appeal with the county assessor's office disputing the assessed value of the St. Charles Center Property. PAR filed the appeal, but was unsuccessful in obtaining a reduction in assessed value. At GMB's request, PAR appealed the matter to the Missouri State Tax Commission.

In the spring of 2003, and while the St. Charles Center Property appeal was pending before the Missouri State Tax Commission, PAR met with GMB to discuss the assessed value of some additional GMB properties. PAR was instructed to evaluate up to eight GMB properties, and was provided with information necessary for its review. Ultimately, it was determined that reductions in assessed values would be sought for four of the eight properties (the "Four Properties").[1] Although there was no Standard Real Property Tax Consulting Agreement referencing these properties, it is undisputed that GMB provided PAR with information necessary for an evaluation of the Four Properties' assessed value, such as income and expense reports, leases, and physical descriptions.

In May 2003, an informal meeting was held before a commercial appraiser with the county assessor's office to discuss the assessed value of the Four Properties. Steven Weber from PAR and Kent Evans from GMB were in attendance at the meeting with the assessor. Weber and Evans both testified that Weber made a presentation regarding the Four Proper-

ties. The meeting concluded with the assessor asking Evans to provide the assessor's office with additional information, which he did. Ultimately, the assessor agreed to reduce the assessed value of the Four Properties. In exchange for these reductions, GMB agreed to abandon the appeal that was pending before the Missouri State Tax Commission.

PAR invoiced GMB for 33.33% of its tax savings on the Four Properties for the tax years 2003 and 2004 pursuant to the terms of the 1998 Contract. GMB's Evans sent a letter to PAR refusing to pay the invoices, citing the amount of work that GMB had done for the review of the Four Properties, as well as "poor publicity" and a damaged relationship with the assessor's office that resulted from PAR's failure to follow the proper review process. Evan's concluded his letter by stating, "In addition, there does not appear to be a current contract between our companies."

Subsequently, PAR filed this action against GMB for breach of contract.[2] GMB then filed a counterclaim alleging breach of contract and negligence. Following a bench trial, the trial court found that there was no valid and enforceable contract between PAR and GMB with regard to the Four Properties that are the subject of this dispute. The court concluded that PAR failed to establish an agreement, meeting of the minds, consideration or other requirements of a contract with respect to the Four Properties. The court found that because the 1998 Contract reserved essential terms for future determination, it was unenforceable. The court further found that it was "unreasonable and unfair to allow [PAR] to rely on a five

---

1. The four properties as identified by the parties were: 1551 Wall Street, Wall Street Suites, Travel Lodge, and 88 Hubble Drive.

2. PAR's petition included three causes of action: breach of contract, statement of account and account stated. PAR only appeals that portion of the judgment that found in favor of GMB on PAR's claim for breach of contract.

year old contract with its essential terms undefined." The court entered judgment in favor of GMB on all of PAR's claims. Having ruled that there was no valid, enforceable contract, the trial court found that the parties owed each other no duty, and therefore also entered judgment in favor of PAR on GMB's counterclaims for breach of contract and negligence. Only PAR appeals.[3]

## II. DISCUSSION

### A. Standard of Review

We will affirm the judgment of the trial court unless it is not supported by substantial evidence or is against the weight of the evidence, or unless the trial court erroneously declares the law or erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). In determining whether the judgment is supported by substantial evidence, we view the evidence in the light most favorable to the judgment and defer to the trial court's credibility determinations. *Barrows v. Firstar Bank*, 103 S.W.3d 386, 390 (Mo. App. W.D.2003). "While we give deference to the trial court's factual determinations, questions of law are reserved for the independent judgment of the appellate court and are reviewed without deference to the circuit court's determination." *Olathe Millwork Co. v. Dulin*, 189 S.W.3d 199, 203 (Mo.App. W.D.2006). The interpretation of a contract is an issue of law,

which we review *de novo* on appeal. *Monsanto Co. v. Syngenta Seeds, Inc.*, 226 S.W.3d 227, 230 (Mo.App. E.D.2007).

### B. The 1998 Contract is Valid and Enforceable

In its second point on appeal,[4] PAR argues that the trial court erred in finding that the essential terms of the 1998 Contract were not sufficiently certain to create a valid agreement governing the Four Properties. We agree.

#### 1. Applicable Law

■ At issue in this case is whether there was mutuality of agreement between the parties. Mutuality of agreement is an essential element of contract formation. *See Olathe Millwork Co.*, 189 S.W.3d at 203 ("[T]he essential elements of a contract are: (1) competency of the parties to contract; (2) subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation."). The trial court found that PAR could not establish the existence of an enforceable contract because there was no meeting of the minds regarding the Four Properties. In so finding, the trial court determined that 1998 Contract was unenforceable because it reserved an essential term, i.e. the name(s) of the properties to be reviewed, for future determination.

■ While there can be no contract if the terms of an asserted agreement are too uncertain, "when the parties have writ-

---

**3.** GMB does not appeal the denial of its counterclaims.

**4.** PAR's brief contains two points on appeal. In its first point on appeal, PAR argues that the trial court erred in ruling that PAR was unable to contract or conduct business at all times relevant to the complaint, and therefore any alleged agreement between the parties was unenforceable, because PAR was administratively dissolved on August 28, 2000. GMB agrees with PAR that under Section

351.488 RSMo 2000, the Secretary of State's reinstatement of PAR as a Missouri corporation on October 12, 2004, related back to the original date of dissolution, and therefore the trial court's finding that PAR was unable to contract or conduct business from August 28, 2000, until October 12, 2004, was in error. Because there is no disagreement between the parties regarding this issue, and because we reverse on other grounds, we will limit our discussion to PAR's second point on appeal.

ten down an agreement in terms to which they both have acceded, the courts are reluctant to hold the agreement ineffectual for indefiniteness." *Maupin v. Hallmark Cards, Inc.,* 894 S.W.2d 688, 695 (Mo.App. W.D.1995). This is especially true when the other party has performed his part of the agreement. *Id.*

> Determination that an agreement is sufficiently definite is favored in the courts, so as to carry out the reasonable intention of the parties if it can be ascertained. A contract is sufficiently definite if it contains matter which would enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if necessary relevant extrinsic evidence.

*Id.* (internal quotations omitted). Thus, the essential terms of a contract must be certain or capable of being rendered certain through the ordinary cannons of construction, or by reference to something certain. *Ketcherside v. McLane,* 118 S.W.3d 631, 636 (Mo.App. S.D.2003). In other words, the terms must be "sufficiently definite to enable the court to give it an exact meaning." *Id.* Uncertainty or indefiniteness is a matter of degree. *Id.* "In determining whether a term is too uncertain to be enforced, a court is guided by general principles of law applied with common sense and in the light of experience." *Id.* (internal quotations omitted).

**2. The Plain Language of the 1998 Contract**

■■■■ The cardinal rule of contract interpretation is to determine the intent of the parties and to give effect to that intent. *Monsanto,* 226 S.W.3d at 231. The terms of a contract are to be read as a whole to determine the intention of the parties. *Id.* We give the terms of a contract their plain, ordinary and usual meaning. *Id.* Here, the 1998 Contract plainly states that PAR will pursue appeals of real estate tax assessments that it determines to be excessive for "the calendar year 1998 and thereafter." Thus, the agreement's plain language indicates that the parties intended to create an on-going business relationship and that the contract would govern that relationship in years subsequent to 1998. In addition, the language of the 1998 Contract states that PAR's efforts will extend to *"all real properties* owned, managed or controlled by [GMB], the names or locations of which [GMB] will hereafter provide to PAR, including *without limitation* ... 2187 First Capital Dr., St. Charles, MO." (emphasis added). The agreement also states that upon its termination, "[GMB] will nevertheless pay the agreed commission provided above for *any of the properties* for which PAR has initiated efforts to reduce the assessment or has been authorized to do so . . . ." (emphasis added). Thus, the plain language of the 1998 Contract clearly contemplates its application to other properties for which PAR was involved in obtaining reductions in assessed values, and even that PAR would receive commissions for other properties after the agreement's termination.

**3. The Extrinsic Evidence Supports a Finding of Mutuality of Agreement**

■■■■ We find that, based on its plain language, the 1998 Contract was valid and the rights and duties created therein are presently enforceable. To the extent that the term identifying the properties for which PAR was to receive a commission is uncertain, it can be made certain by reference to extrinsic facts. *See Maupin,* 894 S.W.2d at 695 (a contract is sufficiently definite if its terms can be defined with the aid of extrinsic evidence). The evidence shows that the parties understood that PAR would receive a commission for reductions in assessed values for properties that were not specifically named in the

contract, but rather were identified by the parties at times subsequent to the 1998 Contract. Paul Campbell, the Chairman of the Board and Vice–President of GMB who signed the 1998 Contract, admitted at trial that the agreement's language contemplated PAR's future work on additional properties. In fact, following the successful appeal of the property specifically named in the 1998 Contract, GMB requested that PAR evaluate a second piece of real estate, the St. Charles Center Property, which was not named in the original agreement. The parties did not execute a new agreement specifically naming this second property. Nevertheless, upon PAR's successful appeal of the St. Charles Center Property in 2000, GMB paid PAR its commission of 33.33% of the tax savings realized pursuant to the terms stated in the 1998 Contract. Later, in 2002, GMB once again requested that PAR file an appeal on the St. Charles Center Property but did not execute a new contract specifically naming the property. Without executing additional agreements, GMB identified additional appeals for PAR to pursue, PAR pursued these appeals, and GMB paid PAR's commission for the successful appeals. We find that this conduct is evidence that the parties intended for the 1998 Contract to create an on-going business relationship and to govern PAR's entitlement to commissions for subsequent properties for which reductions in assessed value were obtained.

Likewise, PAR's work on the Four Properties took place without the execution of a new contract. The evidence showed that PAR's Steven Weber and representatives from GMB met in early 2003 to discuss the assessed values of a number of GMB properties. At the time of this meeting, the second appeal on the St. Charles Center property was pending before the Missouri State Tax Commission. At this preliminary meeting, as many as eight properties were identified for PAR to evaluate. During a second meeting between Weber and GMB's Kent Evans, PAR was instructed to seek reductions in the assessed value of the Four Properties. GMB provided PAR income and expense reports, leases, and physical descriptions for these properties in preparation for a meeting with a commercial appraiser at the county assessor's office. Weber arranged an informal meeting with Powelson, which both he and Evans attended, and at which Weber made a presentation in support of reductions in the assessed values of the properties.

The evidence showed that GMB was fully aware of PAR's involvement in obtaining reductions in assessed values for the Four Properties. The evidence also showed that the information GMB provided to PAR on the Four Properties was similar to the information provided to PAR on the previous properties for which PAR had been successful in obtaining reductions in assessed value. Moreover, it is undisputed that PAR reviewed and evaluated the information GMB provided, met with GMB on multiple occasions to discuss appeals on these properties, and met with and made a presentation to a county assessor. It seems unreasonable to infer from the evidence that GMB believed that PAR would be involved in the evaluation and appeals of these properties without any expectation of payment if the appeals were successful. Thus, the extrinsic evidence supports a finding that in 2003, and specifically with respect to the decision to file appeals regarding the Four Properties, the parties were operating under the terms of the 1998 Contract and intended the 1998 Contract to govern their relationship.

### 4. Conclusion

We find that the 1998 Contract was sufficiently definite in its terms and thus

was a valid and enforceable agreement. Furthermore, to any extent that the 1998 Contract was indefinite because it left for future determination the identification of additional properties to be evaluated and/or appealed, we find that the extrinsic evidence, specifically the conduct of the parties in 1998, 2000, 2002 and 2003, and the ongoing nature of the parties' business relationship, establishes that the parties intended to create a binding contract in 1998 that would thereafter govern PAR's entitlement to commissions for successful appeals of additional properties.

Therefore, the trial court's judgment finding that the 1998 Contract was unenforceable erroneously applied the law and was against the weight of the evidence. The plain language of the 1998 Contract, and the subsequent actions of the parties, establishes that the parties entered into a valid contract in 1998 that was enforceable as to the Four Properties. Point two is granted.

### III. CONCLUSION

Based on the foregoing, we reverse and remand for entry of judgment not inconsistent with this opinion.

ROY L. RICHTER, P.J. and CLIFFORD H. AHRENS, J., concur.