

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| DEBRA WOODSON, | ) | No. ED107947 |
| | ) | |
| Plaintiff, | ) | Appeal from the Circuit Court of |
| | ) | St. Charles County |
| vs. | ) | Cause No. 1011-CV07534 |
| | ) | |
| BANK OF AMERICA, N.A. and MILLSAP | ) | Honorable Daniel G. Pelikan |
| & SINGER, LLC, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| MILLSAP & SINGER, P.C. and MILLSAP | ) | |
| & SINGER, LLC, | ) | |
| | ) | |
| Respondents. | ) | Filed:  June 2, 2020 |

James M. Dowd, P.J., Gary M. Gaertner, Jr., J., and Robin Ransom, J.

### Introduction

Gregory Leyh, the plaintiff's expert witness in the above-styled case, appeals the judgment that granted Millsap & Singer's motion to enforce settlement and imposed a monetary sanction against Leyh.  The disputed settlement concerns contempt proceedings brought by Millsap alleging Leyh violated a protective order by disclosing in a separate lawsuit a deposition marked confidential which Leyh had received in his capacity as an expert witness in this case.

We affirm the judgment to the extent it held that on July 26, 2018, the parties reached a settlement of the contempt proceedings.  We reverse the remainder of the judgment including the

$35,000 sanction against Leyh imposed by the trial court because we find Leyh did not engage in bad faith or unethical conduct.

## Background

Leyh and Millsap have been battling in litigation for years. Leyh has represented hundreds of plaintiffs in lawsuits against Millsap alleging Millsap engaged in improper conduct in connection with its own legal representation of banks and mortgage holders in foreclosure and collection matters. In 2017, Leyh was appointed class counsel in the *Stagner v. Wells Fargo Bank et al.,* class action pending in Ray County, Missouri which includes claims against Millsap for similar improper conduct. Millsap, for its part, has sought to sanction Leyh, decertify the *Stagner* class, and has filed suit against Leyh personally for malicious prosecution and abuse of process.

The underlying suit here, not brought by Leyh but by a different attorney, was filed on behalf of Debra Woodson in 2010 against Millsap and its client Bank of America for wrongful foreclosure after the bank instructed Woodson to stop making mortgage payments in order to qualify for a loan modification but then the bank began foreclosure on her home. Leyh was hired by Woodson's counsel to testify as an expert witness on issues addressing Millsap's liability. In August 2014, the parties entered into a protective order which provided that documents marked confidential were not to be disclosed or used in any current or future litigation. Woodson's counsel testified that he failed to notify Leyh of the existence of the protective order or provide him with a copy of it. Likewise, Leyh testified that he was unaware of the existence or dictates of the protective order.

Nevertheless, as plaintiff's expert, Leyh received a copy in 2014 of the deposition taken in this case of Vernon Singer, of the Millsap & Singer law firm. The deposition was marked

2

confidential. Then, in December 2017, in his role as class counsel in the *Stagner* litigation, Leyh disclosed the Singer deposition during discovery in that case. So, on March 9, 2018, Millsap filed its motion for contempt alleging that Leyh's disclosure and use of the Singer deposition was a knowing and intentional violation of the *Woodson* protective order which warranted holding him in contempt. The court issued to Leyh its order to show cause why he should not be held in contempt and set the matter for hearing on July 26, 2018 at 2:00 p.m.

As the time for the hearing approached, the parties discussed settlement. These negotiations continued on July 26th as Leyh and his counsel made their way together by automobile across Missouri to the St. Charles County courthouse for that afternoon's hearing. Eventually, an outline of the terms under negotiation was transcribed into a 10-paragraph, one-page document titled "Memo Memorializing Settlement by and between Greg Leyh, et. al and Millsap & Singer, et al."

The 3 paragraphs of the memorandum most relevant to this opinion are as follows:

1. $35,000 cash payment by Leyh to Millsap & Singer, PC in 14 days after execution of the settlement agreement.

2. Leyh agrees to be bound by the Woodson Protective Order.

\*\*\*

10. Settlement to be completed in final settlement agreement.

As for the remainder of the memorandum, paragraphs 3, 5, 6, and 7 generally require Leyh to rectify any past disclosures which he may have already made of materials covered by the protective order and to take specific actions going forward with respect to the protective order. Paragraph 4 deems the settlement confidential, paragraph 8 calls for the dismissal of the

3

*Woodson* case upon Leyh's settlement payment and the exchange of mutual releases, and paragraph 9 states that each side will be responsible for its own attorney's fees and costs.

The July 26th negotiations culminated in the 3 o'clock hour. At 3:12 p.m., Leyh's counsel received from Millsap the final version of the memorandum. Leyh's counsel agreed to it at 3:18 p.m. Then, Millsap's counsel, with Leyh's counsel's consent, advised the court that the matter had been settled and that the hearing should be cancelled which it was.

However, during the succeeding months, the parties disputed both the terms of the purported settlement and whether the matter was even settled. The first post-July 26th communication between the parties occurred on August 13, 2018 when Millsap's counsel sent Leyh's counsel a draft of the final settlement agreement and release of all claims. While that document tracked most of the terms set forth in the July 26th memorandum, Millsap unilaterally changed paragraph 2 from "Leyh agrees *to be* bound by the Woodson Protective Order" to "Leyh agrees he *is* bound by the Woodson Protective Order." (Emphasis added.). Leyh refused to sign this document and instead, on August 22, 2018, sent Millsap a new version of the July 26th memorandum which revised paragraph 2 to read "*As of the effective date*, Leyh agrees to be bound by the Woodson Protective Order." Millsap rejected this proposal.

On October 3, 2018, Millsap's counsel emailed Leyh's counsel and attached a new version of the final settlement agreement. The email stated: "The only issue remaining to be resolved on the settlement agreement was the language of paragraph 2. Since the parties could not agree on the revisions as proposed, we reverted back to the precise language of the settlement memo. We assume you/Greg will not have an issue with this approach as you have previously stated the memo controls." Numerous communications between counsel followed including efforts by Leyh's counsel to obtain Leyh's signature on the agreement but Leyh never signed.

4

On November 1, 2018, Millsap filed its motion to enforce settlement. Millsap asserted that the parties reached a settlement on July 26, 2018 at approximately 3:18 p.m. when Leyh's counsel "agreed" to the memorandum and Millsap's counsel, with Leyh's counsel's consent, notified the court that the matter had been settled and that the contempt hearing should be cancelled. Millsap alleged that after the parties were unable to agree to the form and substance of a final settlement agreement to be formally signed by both parties, Leyh should be compelled to execute the October 3, 2018 version of the agreement which parroted the terms set forth in the July 26th memorandum.

In his response, Leyh denied that the matter had been settled. He claimed that the language of paragraph 10 of the July 26th memorandum—"Settlement to be completed in final settlement agreement"—meant that there was no agreement until he *approved* and *signed* a final settlement agreement. Leyh also claimed that the extensive post-July 26th communications between the parties demonstrated that no final agreement had been reached on July 26th or at any time. Leyh's argument relied on Millsap's counsel's August 13th unilateral change to the language of paragraph 2, one of the critical terms of the July 26th memorandum. Leyh argued that Millsap's change to the verb tense in paragraph 2 addressing when Leyh's obligation under the *Woodson* protective order began, carried significant implications for the parties' other on-going litigation and demonstrated that the parties had not reached an agreement.

Leyh further argued that Millsap's October 3rd emailed statement that "[t]he only remaining issue to be resolved on the settlement agreement was the language in paragraph 2" further demonstrated that no agreement had been reached.

After a two-day hearing, the trial court issued its judgment in which it made a number of findings and conclusions relevant to our analysis. First, the court found that the parties had in

5

fact reached a settlement on July 26, 2018 at 3:18 p.m. and memorialized it in their 10-paragraph memorandum. The court then delved into the parties' extensive post-July 26th communications and negotiations regarding the terms of a formal settlement agreement before concluding that Leyh's counsel had accepted the October 3, 2018 iteration of the settlement agreement, which the court found had reverted back to the terms of the July 26th memorandum, and Leyh's refusal to execute that October 3, 2018 version of the agreement was in bad faith.

The court rejected as not credible Leyh's assertion that his counsel had the authority to *negotiate* but not *settle* the dispute. Moreover, the court found that Leyh's failure to advise Millsap's counsel that his own counsel's authority was limited in this regard constituted a violation of Rule 4-4.1[1] of the Missouri Supreme Court's Rules of Professional Responsibility that imposed on Leyh as an attorney the duty to be truthful to opposing counsel. As a result, the court imposed a $35,000 sanction against Leyh based on this finding that he had acted unethically and in bad faith.

The court also rejected Leyh's contention that paragraph 10 of the July 26th memorandum was an essential term of the agreement which meant that until Leyh approved and signed the final settlement agreement, there was no agreement. The court found that paragraph 10 was not an essential term but merely recognized that the parties intended to put the essential terms of its July 26th agreement into a formal settlement agreement. Leyh now appeals.

## Standard of Review

We will affirm the judgment of the trial court unless it is not supported by substantial evidence or is against the weight of the evidence, or unless the trial court erroneously declares the law or erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

---

[1] All references are to Missouri Supreme Court Rules (2019).

6

In determining whether the judgment is supported by substantial evidence, we view the evidence in the light most favorable to the judgment and defer to the trial court's credibility determinations. *Barrows v. Firstar Bank*, 103 S.W.3d 386, 390 (Mo. App. W.D. 2003). While we give deference to the trial court's factual determinations, questions of law are reserved for the independent judgment of the appellate court and are reviewed without deference to the circuit court's determination. *Olathe Millwork Co. v. Dulin*, 189 S.W.3d 199, 203 (Mo. App. W.D. 2006). The interpretation of a contract is an issue of law, which we review *de novo*. *Monsanto Co. v. Syngenta Seeds, Inc.*, 226 S.W.3d 227, 230 (Mo. App. E.D. 2007).

**Discussion**

I.      *The July 26, 2018 settlement agreement.*

We agree with the trial court that the parties settled their dispute on July 26, 2018 and memorialized the terms in their 10-paragraph memorandum. But we disagree with the trial court regarding the post-July 26th communications and negotiations and we hold that they were nothing more than unsuccessful attempts to modify this already-formed and enforceable agreement. Our holding is based on the parties' unequivocal expressions of assent in their written and spoken words and in their actions on the afternoon of July 26th. And not lost on our analysis are the surrounding circumstances. The impending hearing and the court's forthcoming decision on whether to hold Leyh in contempt imposed an urgency on the parties' negotiations. This urgency was illustrated by both side's active engagement in the negotiations including Leyh's and his counsel's participation from their vehicle on the road to St. Charles. Necessity may be the mother of invention, but an impending trial or hearing is often the mother of settlement.

7

Our analysis, of course, is governed by contract law. *Voyles v. Voyles*, 388 S.W.3d 169, 172 (Mo. App. E.D. 2012). To determine whether an agreement was formed, we look for the essential elements of a contract: offer, acceptance, and consideration and whether there was a meeting of the minds and mutual assent to the essential terms of the agreement. *Id.* Mutuality of agreement is determined by looking at both the intentions of the parties as expressed or manifested in their words or actions, *Dancin Dev., LLC v. NRT Mo., Inc.*, 291 S.W.3d 739, 745 (Mo. App. E.D. 2009), and the circumstances surrounding the parties' relationship. *Women's Care Specialists, LLC v Troupin,* 408 S.W.3d 310, 318 (Mo. App. E.D. 2013). Because Missouri public policy favors settlement of litigation, courts will generally enforce settlement agreements when warranted. *See, e.g., Andes v. Albano*, 853 S.W.2d 936, 940 (Mo. banc 1993).

At 3:12 p.m. on July 26th, Millsap's counsel emailed to Leyh's counsel for his approval the 10-paragraph memorandum bearing the terms of settlement the parties had negotiated. Six minutes later, Leyh's counsel responded with a one-word email: "Agreed." Both counsel then agreed that the court should be notified that the matter was settled in lieu of the hearing. Millsap's counsel notified the court and the hearing never took place. Again, these words and actions, particularly when they include a representation to the court, demonstrate an unequivocal assent to a settlement of the parties' dispute with the terms set forth in the July 26th memorandum.

Moreover, the memorandum readily satisfies our contract law principles that for a contract to be complete and enforceable, the essential terms of the contract must be certain or capable of certain interpretation. *Arkansas-Missouri Forest Products, LLC v. Lerner*, 486 S.W.3d 438, 448 (Mo. App. E.D. 2016). That is, the terms of agreement must be sufficiently definite to enable the court to give it an exact meaning. *Id.* Determining that an agreement is

8

sufficiently definite is favored in the courts in order to carry out the reasonably ascertainable intention of the parties. *Maupin v. Hallmark Cards, Inc.*, 894 S.W.2d 688, 695 (Mo. App. W.D. 1995). A contract is valid and enforceable even if some terms are missing or left to be agreed upon as long as the essential terms are sufficiently definite for the court to give them exact meaning. *Vulgamott v. Perry*, 154 S.W.3d 382, 390 (Mo. App. W.D. 2004). Here, the memorandum is specific as to the mutual obligations of the parties and reflects in its detail the parties' intent to fully compromise their dispute.

II. *The post-July 26th negotiations and communications.*

a. *Millsap muddies the waters.*

Instead of simply transferring the well-crafted and agreed-upon terms from the July 26th memorandum to a formal settlement agreement for the parties' signatures as called for in the memorandum, Millsap chose to unilaterally modify the critical paragraph 2 from "Leyh agrees *to be* bound by the Woodson Protective Order" to "Leyh agrees he *is* bound. . .". While Millsap's change to paragraph 2 may appear slight and mundane, the record belies such characterizations.

The subtle change to the tense of the verb "to be" in the context of this case given the parties' antagonistic history carried substantial implications. It was a unilateral change to a key, if not the key, term—Leyh's obligation to be bound by the protective order and when that obligation begins. We find it remarkable and noteworthy, given the parties' rancorous relationship, that Millsap would endeavor to make this change and Leyh's fear that the change might arm a collateral attack by Millsap against Leyh in their other litigation cannot be dismissed. And in this context, Millsap's rejection of Leyh's August 22nd proposed amendment to add the phrase "[a]s of the effective date" to paragraph 2, a seemingly harmless change that

9

merely reiterated the forward-looking character of Leyh's obligation under the protective order, arguably reveals the backward-looking goal of Millsap's original change from "to be" to "is".

Nevertheless, if Leyh refused altogether to sign the formal settlement agreement in response to Millsap's unilateral change to paragraph 2, even after Millsap reverted the language back to the agreed-upon July 26th iteration, including changing "is" back to "to be", that is probably an overreaction on Leyh's part. For in our judgment "to be bound" and "is bound," in the specific factual context of this settlement agreement only, mean the same thing—that Leyh's obligation to abide by the *Woodson* protective order begins when the agreement becomes final, not before. And "is bound" here does not mean that Leyh somehow agreed that he was bound back in 2014 when he received the deposition marked confidential or in 2017 when he disclosed it or at any other time. In any event, it is apparent from our review of the record that Millsap's initial change to the language of paragraph 2 likely fueled and exacerbated the length, intensity, and cost of this litigation.

b.      *The parties' post-July 26th discussions did not modify the July 26th agreement.*

So what to make of the parties' months long jousting leading up the hearing on the motion to enforce settlement? In our judgment, the convoluted record of post-July 26th proposals and counter-proposals accomplished nothing from a contractual standpoint because the parties neither modified the July 26th agreement nor formed a new agreement. The closest the parties got was the October 3rd iteration, but that document merely reverted back to the July 26th agreement the parties already formed. And by then, the atmosphere had been tainted by Millsap's unilateral effort to amend paragraph 2 and its October 3rd admission that "[t]he only remaining issue to be resolved on the settlement agreement was the language in paragraph 2."

10

In order for a modification of a prior contract to be enforceable, it must be based on mutual assent and supported by consideration. *Kells v. Mo. Mountain Properties, Inc.*, 247 S.W.3d 79, 84 (Mo. App. S.D. 2008). To determine whether there was a meeting of the minds, we look to the parties' objective manifestations of intent. *Guidry v. Charter Comm., Inc.*, 269 S.W.3d 520, 528 (Mo. App. E.D. 2008). "A meeting of minds occurs when there is a definite offer and an unequivocal acceptance." *Id.* "Generally, contracts may be modified as to particular provisions or have new terms engrafted thereon, yet stand as to the residue of the original agreement." *MECO Systems, Inc. v. Dancing Bear Ent., Inc.*, 42 S.W.3d 794, 803 (Mo. App. S.D. 2001).

The record here demonstrates no agreement was reached as to either party's attempt to modify paragraph 2 of the the July 26th agreement. Each party's proposed change to paragraph 2 was rejected by the other. Even as late as October 3rd, Millsap acknowledged the parties had failed to reach agreement on modifying paragraph 2 and therefore he proposed reverting back to the original July 26th agreement. This record demonstrates nothing more than failed attempts to modify the July 26th agreement.

Though not addressed by either side, the parties' post-July 26th discussions conjure the question whether the parties somehow rescinded the original July 26th agreement. "Where a party, even without right, claims to rescind a contract, if the other party agrees to the rescission or does not object thereto and permits it to be rescinded, the rescission is by mutual consent." *Rosenblum v. Jacks or Better of America West Inc.*, 745 S.W.2d 754, 759 (Mo. App. E.D. 1988) (quoting *Alropa Corp. v. Smith*, 199 S.W.2d 866, 871 (Mo. App. 1947)). "So, a contract will be treated as abandoned where the acts of one party inconsistent with its existence are acquiesced in by the other." *Id.* An executory contract, especially one of accord and satisfaction or

11

compromise and settlement, may be rescinded by mutual agreement without other consideration. *Rosenblum*, 745 S.W.2d at 759. However, mere requests to change the terms of a contract are not, in and of themselves, enough to constitute repudiation. *Wooten v. DeMean*, 788 S.W.2d 522, 526 (Mo. App. S.D. 1990).

Here, although during their post-July 26th discussions the parties at times meandered away from their July 26th agreement and some of its terms, both parties continued to manifest their assent to the essential terms of that agreement. No rescission occurred.

    *c.*    *Paragraph 10 of the July 26th agreement did not give Leyh a do-over.*

We reject Leyh's argument that paragraph 10 of the July 26th agreement—"Settlement to be completed in final settlement agreement"—meant that Leyh was not bound until he had approved and signed a formal settlement document. We agree with the trial court's finding that paragraph 10 was merely a statement recognizing the parties would incorporate the terms of settlement into a standard written settlement agreement.

"The mere fact that parties contemplate a formal written draft of their agreement at a later time is not sufficient in itself to demonstrate that they did not intend to be bound at the time of their original agreement." *Hunt v. Dallmeyer*, 517 S.W.2d 720, 724 (Mo. App. 1974); *see also Matthes v. Wynkoop*, 435 S.W.3d 100, 107 (Mo. App. W.D. 2014). In *Shapleigh Inv. Co. v. Miller*, 193 S.W.2d 931, 937 (Mo. App. 1946), this Court observed:

> Where parties negotiate an agreement and clearly express an intention not to be bound until a formal contract is executed, such intention must be respected. But, where the parties fail to state that their negotiations are to be regarded as merely contingent upon the final execution of a written agreement, the question of whether they intended to be bound by anything less than such a contract is sometimes a rather difficult question. It is

resolved by ascertaining whether the parties actually looked upon the formal writing merely as evidence of their preliminary agreement, or as an operative fact without which they intended not to be bound.

The most important question is whether the parties reached a meeting of the minds on the essential terms of agreement even when some terms are missing or left to be agreed upon. *Vulgamott*, 154 S.W.3d at 390.

Leyh's argument in this regard is simply belied by the record. First, the language of paragraph 10 does not "clearly express an intention not to be bound until a formal contract is executed." *Shapleigh,* 193 S.W.2d at 937. Also, when Leyh agreed that the trial court should be notified that the matter was settled, no effort was made to clarify that the settlement was not final until signed. While Leyh argues that this provision was an essential term of the agreement, we disagree and instead find that paragraphs 1 through 9 constitute the essential terms of the settlement the parties reached on July 26th.

### III. *The $35,000 sanction against Leyh.*

While trial courts have inherent powers to sanction parties who act in bad faith, courts are encouraged to do so "sparingly, wisely, temperately, and with judicial self-restraint." *A.J.H. ex rel. M.J.H. v. M.A.H.S.*, 364 S.W.3d 680, 682 (Mo. App. E.D. 2012). A court should rarely invoke this inherent power because "[i]t is only one short step from the assertion of inherent power to the assumption of absolute power." *Id.* (quoting *McPherson v. U.S. Physicians Mutual Risk Retention Group*, 99 S.W.3d 462, 477 (Mo. App. W.D. 2003)). Our review is for an abuse of discretion and we will reverse when there is no evidence in the record supporting a finding of bad faith. *Hale v. Cottrell, Inc.*, 456 S.W.3d 481, 488 (Mo. App. W.D. 2014).

In *A.J.H.,* we identified two bases for allowing a court to impose sanctions based on its inherent authority: first, to allow the court to vindicate its judicial authority without resorting to more drastic sanctions like contempt; and second, to make a prevailing party whole for expenses caused by his opponent's obstinacy. 364 S.W.3d at 682 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)). Neither basis is satisfied on this record. As for the first basis, we find nothing showing that Leyh undermined the court's authority, such as by disobeying a court order, that would require the court to "vindicate its judicial authority" by sanctioning him.

Similarly, as for the second basis described in *A.J.H.*, the record does not reflect that the delay in finalizing the parties' July 26th settlement was the result of Leyh's obstinacy. Leyh agreed to settle this case on July 26th. He authorized his counsel to negotiate and agree to the terms of the settlement, and then to notify the court that the matter had been settled and the hearing could be cancelled. Then, inexplicably, Millsap's representatives sought to unilaterally change the language in a critical paragraph of a document the parties had already agreed upon. And Millsap's later email, with what it asserts was the final agreement that Leyh rejected in bad faith, included Millsap's admission that paragraph 2 was still an open question. Millsap's conduct at a minimum conveyed the impression that the parties were continuing to negotiate. Accordingly, these facts do not support a finding that Leyh acted in bad faith in his reluctance to sign the document. Frankly, the record is more supportive that Millsap's conduct was the likely cause of the months-long delay and increased costs.

While there is no concrete definition of "bad faith," it embraces something more than bad judgment or negligence. *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 447 (Mo. banc 1986). "It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Id.* "It also embraces

14

actual intent to mislead or deceive another." *Id*. Although Leyh may have refused to sign even after Millsap on October 3, 2018, reverted the language back to their July 26[th] memorandum, his conduct on this record does not rise to the level of bad faith.

Nevertheless, we would likely take a different view of the trial court's bad faith finding against Leyh if Millsap had simply transcribed the nine essential paragraphs of the July 26th memorandum onto a formal settlement agreement and Leyh refused to sign it. But those are not these facts.

We also reverse the trial court's finding that Leyh violated Rule 4-4.1 of the Missouri Supreme Court's Rules of Professional Responsibility by failing to notify Millsap that Leyh's counsel did not have authority to settle the case, only to negotiate it. First, Leyh was not acting as a lawyer in this case but as an expert witness and Rule 4-4.1 applies to lawyers when acting "[i]n the course of representing a client."

Nevertheless, we acknowledge that even though he was not acting as an attorney in this case, Leyh is still an officer of the court and had a duty not to make misrepresentations. *In re Hess*, 406 S.W.3d 37, 45 (Mo. banc 2013). But this record does not support the conclusion that Leyh made any misrepresentation, engaged in any unethical conduct, or otherwise acted in bad faith. Based on our careful review of the transcript, the conclusion that Leyh engaged in some nefarious and unethical sleight of hand by claiming his attorney had the authority to negotiate but not settle the case distorts the record. Leyh argued that paragraph 10 meant that the case was not settled until he approved and signed a yet-to-be-drafted formal settlement agreement. In other words, he claimed to have the final say on whether the case was settled, not his attorney. While we have rejected this argument, it appears on its face at least to have an arguable good-faith basis in the language of paragraph 10. So, when viewed in this context, Leyh's argument that his

15

attorney did not have the final authority to settle the case is a natural extension of his argument based on paragraph 10. In both instances, Leyh is asserting that this case is not settled until Leyh himself approved and signed.

**Conclusion**

We affirm in part and reverse in part.[2] We affirm that portion of the judgment holding that on July 26, 2018, the parties reached a settlement of the pending contempt proceedings and memorialized the essential terms of that agreement in paragraphs 1 through 9 of their July 26th memorandum referenced herein. We reverse the remainder of the judgment because we find that all communications and negotiations that occurred following July 26th were merely unsuccessful attempts to modify the already-formed July 26th agreement. We also reverse the judgment to the extent it found Leyh engaged in bad faith and unethical conduct and imposed a $35,000 sanction against him.

_____
James M. Dowd, Presiding Judge

Gary M. Gaertner, Jr., J., and
Robin Ransom, J. concur.

---

[2] We deny Leyh's argument that the trial court lacked personal jurisdiction over Leyh in this matter because that issue was not properly before us. *See Jessen v. Jessen*, 450 S.W.3d 425, 429 (Mo. App. W.D. 2014). Furthermore, we deny Millsap's motion to strike Leyh's brief because we find that Leyh's brief readily complies with Rule 84.04.