CITY OF KANSAS CITY, Missouri,
Respondent,

v.

Georgia J. CARLSON, Appellant.

No. WD 72198.

Missouri Court of Appeals,
Western District.

Oct. 26, 2010.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 7, 2010.

Application for Transfer Denied
Jan. 25, 2011.

Jonathan Sternberg, Kansas City, MO,
for Appellant.

Megan Pfannenstiel and Lowell C. Gard,
Assistant City Prosecutors, Kansas City,
MO, for Respondent.

Before Division II: JOSEPH M. ELLIS, Presiding Judge, and ALOK AHUJA and KAREN KING MITCHELL, Judges.

KAREN KING MITCHELL, Judge.

Georgia Jean Carlson appeals the judgment of the Circuit Court of Jackson County ("trial court") finding that Carlson violated Kansas City's anti-smoking ordinance, No. 080073, and fining her $50. Carlson claims that Health Department officer Aaron Nieft, who gave Carlson the notice of violation, was without authority to do so because he is not a Kansas City police officer. Carlson's notice of violation and the information subsequently signed by the prosecutor were, she argues, therefore null and void. She also challenges the trial court's taking judicial notice of Kansas City housing code provisions. We affirm the judgment of the trial court.

## Factual and Procedural Background

Aaron Nieft is a food inspector with the Kansas City Health Department. On April 10, 2009, Nieft accompanied Regulated Industries, a body under the Department of Health that oversees establishments' compliance with liquor laws, in conducting audits of certain establishments. Nieft was conducting "smoking audits" and stopped with Regulated Industries at JC's Sports Bar, which was known to be a "problem bar." When Nieft entered JC's Sports Bar, he noticed several patrons smoking. Nieft asked the smoking patrons to extinguish their cigarettes, and they complied. Nieft then introduced himself to the bartender, Georgia Carlson, and reminded Carlson that Kansas City ("the City") had an ordinance prohibiting smoking in places of employment. Carlson responded that the bar's owner had instructed her to allow smoking in the bar despite the ordinance. Nieft then asked Carlson for her name

and identification, which she provided, and Nieft issued Carlson a notice of violation, directing Carlson to appear in the municipal court on May 11, 2009. Carlson refused to sign the notice of violation.

After the municipal court found that Carlson had violated the City's anti-smoking ordinance by allowing patrons to smoke inside JC's Sports Bar, Carlson sought a trial de novo before the circuit court. At the trial, Nieft testified as to the facts above and also that he had been trained by the city prosecutor on giving notices of violation such as the one he had issued Carlson. Nieft testified that when he asked a bar or restaurant employee for identification and attempted to issue a notice of violation, the employee did not have to cooperate with him, but if he or she did not, Nieft would call the police and his supervisor to deal with the violation. Carlson was not present and did not testify. The trial court found that the City had shown that Carlson had violated the ordinance and that there was no legal basis to find that Nieft was not permitted to issue the citation. Therefore, the trial court entered judgment for the City. This appeal follows.

## Standard of Review

We affirm the judgment of the trial court in a court-tried case unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). In this case, Carlson alleges that the trial court made errors of law, which we review de novo. *Jackson v. Mills*, 142 S.W.3d 237, 240 (Mo.App. W.D. 2004).

## Judicial Notice of Municipal Ordinances Not in the Record

For her first point on appeal, Carlson alleges that the trial court erred

in "holding" that it could take judicial notice of municipal ordinances, which were not in evidence, that the court felt were analogous to those at issue in Carlson's case. Section 479.250 [1] provides:

> In the trial of municipal ordinance violation cases, a copy of a municipal ordinance which is certified by the clerk of the municipality shall constitute prima facie evidence of such ordinance. If such certified copy is on file with the clerk serving the judge hearing a case and readily available for inspection by the parties, the judge may take judicial notice of such ordinance without further proof.

Outside of the provisions of this statute, a court generally "may not take judicial notice of the existence or contents of city or county ordinances." *Consumer Contact Co. v. State*, 592 S.W.2d 782, 785 (Mo. banc 1980). The only city ordinances that were before the trial court were certified copies of the anti-smoking ordinance, No. 080073, and parts of Chapter 34 of the ordinances, which deals with health and sanitation.

After closing arguments, the trial court made the following comments, which Carlson finds objectionable:

> [W]hat strikes me as—as very interesting is, is that for many years I believe that the City of Kansas City, Missouri has operated the housing code violation court. I believe it's Judge Wayne Cagle who is the judge of that court.
>
> It's also the Court's understanding that there are a substantial number of personnel present and the past who have, on behalf of the City of Kansas City, Missouri, in enforcement of the building codes, issued citations of a type substantially similar to the one that is at issue here. And there have been literally thousands of citations and thousands

of appearances by persons, some represented by counsel, and others who are not[,] in Judge Cagle's courtroom. Some of those matters have been appealed to this division of the court and have been adjudicated on the basis of these employees. None of them are police officers, but all charged with the responsibility of—based upon the employment within certain divisions of the City of Kansas City, Missouri, the responsibility of the enforcement of those areas of the municipal code that are within the purview of their work.

> Now, in this situation it appears that the gentleman who's testified today, Mr. Nieft, is someone who falls squarely within the confines of what ordinarily has been observed in let's say the housing code situation. And I think that it wouldn't be reasonable—Every time we have a statute or rule or regulation, whether it's the code ordinance 34.474, or if you want to go through and look at other sections of Chapter 84 of the Missouri Revised Statutes, there's always a duty upon everyone, and particularly the Court, to interpret statutes in a way that achieves a reasonable result and seems to comport with the intent of what those who would have been involved in these statutes would want.

> And I don't think that it would be reasonable to believe that there would be a desire to have the scarce resources—law enforcement officers, who are going to have to be patrolling these facilities day in and day out to see to it that these various codes, whether they be housing codes or health codes, be enforced.

At this time, Carlson's counsel objected, stating, "Respectfully, none of this infor-

1. All statutory references are to RSMo 2000 unless otherwise noted.

mation about the housing codes or the housing court is in evidence. Frankly—"

*And the trial court continued:*

I understand that. We're simply talking about common sense in understanding how this process works. And I think that the Court has the right to take judicial notice of all ordinances and other things that apply. And by analogy, this is the analysis the Court is taking. And it's on that basis that the Court is going to find ... [t]hat the judgment will be entered for the City, as they've met their burden as to the subject of the cause of action, as they've proved beyond a reasonable doubt the violation. And at this time I do not find that there is a legal basis to find that this person was not permitted to issue this notice.

We agree with Carlson that the trial court would have erred if it had taken judicial notice of any city ordinances that were not properly before the court. Although the trial court may have stated that it was entitled "to take judicial notice" of certain matters beyond the record, it *did not* rely on facts outside the record: to decide a factual issue; as a factor in making a discretionary decision; or to determine a legal issue. The trial court made its decision using common sense and the judge's own general knowledge about the housing code enforcement process that had been gained through his experience on the bench, which is permitted. The City cites *United States v. Bertling*, 370 F.3d 818, 820 (8th Cir.2004), which affirmed a case where the trial court refused to approve funds for an expert witness to testify generally on the effects of domestic abuse. The trial judge in *Bertling* stated that she was already familiar with the effects of domestic abuse from her experience as a trial judge. *Id.* The Eighth Circuit, affirming, stated that the trial court could properly "rel[y] on its general knowledge

about a subject gained by experience on the bench ... to assist it in making a decision." *Id.*

As the City argues, and the trial court's comments suggest, the trial court's decision was based more upon common sense, practicality, and the judge's general knowledge of the process of enforcement of municipal administrative ordinances than upon any impermissible judicial notice of particular ordinances, the contents thereof, or cases involving those ordinances not before the court. *See Rogers v. State*, 265 S.W.3d 853, 858 (Mo.App. S.D.2008) (judge's decision whether to issue a search warrant a "practical, common-sense decision" based on a review of all circumstances); *Prop. Assessment Review v. Greater Mo. Builders*, 260 S.W.3d 841, 846 (Mo.App. E.D.2008) (holding that interpretation of contract terms can be a matter of common sense).

Regardless of the trial court's exact reasoning, we are "primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result. Thus, the judgment will be affirmed if cognizable under any theory, regardless of whether the reasons advanced by the trial court are wrong or not sufficient." *Blue Ridge Bank & Trust Co. v. Trosen*, 221 S.W.3d 451, 457 (Mo.App. W.D.2007) (internal quotation and citation omitted). Because the trial court's decision may be affirmed based upon our analysis of Carlson's second point, as stated below, her first point is denied.

### Authority of Health Department Inspectors to Issue Violation Notices

■ For Carlson's second point on appeal, she alleges that the trial court erred in refusing to dismiss her case because Nieft, who issued the notice of violation to Carlson, was not a Kansas City police offi-

cer. Carlson claims that section 84.460 grants the Board of Police Commissioners of Kansas City "exclusive management and control" of the police force in Kansas City and that, therefore, only Kansas City police officers may issue notices of ordinance violations.[2] In making her argument, Carlson ignores certain portions of the applicable law and takes others out of context.

First, the fact that section 84.460 grants the Board of Police "exclusive management and control" of the police force does not help Carlson. Nieft did not give any orders to any police officers or in any way attempt to control police officers or interfere with police work. He had been prepared to call the police if any bar patrons refused to extinguish their smoking materials, or if Carlson had been uncooperative, but he did not find it necessary. An issuance of a violation notice cannot be deemed an attempt to control the police force.

■ Second, we disagree with Carlson's characterization of the City's health inspectors as a separate police force. The City may properly enact and enforce ordinances designed "to protect the public health and safety" as part of its police power. *City of Kansas City v. Jordan*, 174 S.W.3d 25, 41 (Mo.App. W.D.2005).[3] The health inspectors, or "smoking police" as Carlson refers to them, are primarily responsible for making sure restaurants and other establishments are clean and in compliance with the City's health codes. According to the trial testimony, if an establishment is not up to code, the inspector will typically issue a report notifying the establishment of what needs to be done to comply with the codes. However, when an inspector sees a violation of the smoking ordinance, he or she does notify the smoker of the law and instructs the smoker to extinguish the smoking material. The inspector also will issue a violation notice to the person in charge of the establishment at the time if the inspector finds that the establishment owner or manager is aware of the smoking and has allowed it despite the ordinance prohibiting it. We do not find that this behavior on the part of the health inspectors amounts to unauthorized police work.

Section 84.420 grants the police board the duty and responsibility of, among other things, preventing crime and arresting offenders, and guarding the public health. § 84.420.1(2) & (4). Certainly, if a Kansas City police officer had issued the violation notice to Carlson, he would have been within his authority to do so. However, nowhere in Chapter 84 of the Missouri statutes, in Missouri Supreme Court Rule 37, or in the city ordinances of Kansas City, does it specify that a police officer must, in all cases, issue an ordinance violation notice. On the contrary, section 34–3 of the ordinances allows the director of health to determine when a place of public resort is being operated in a manner as to endanger the health of those attending such place. Further, if the owner or manager fails or refuses to make any changes ordered by the director, "the director shall immediately report such delinquency to

---

2. Carlson notes an exception for licensed private security guards and cites the regulations pertaining to licensed private security guards. Those provisions have no bearing on this case, since Nieft clearly was not a private security officer when he issued Carlson's violation notice.

3. A city has no inherent police power and enjoys only that which has been conferred by the state. However, as a charter city, Kansas City has been granted all of the powers of the Missouri general assembly consistent with the state constitution and statutes. Mo. Const. art. VI, § 19(a). While this power is not unlimited, it is very broad. *Jordan*, 174 S.W.3d at 41.

the city counselor for prosecution before the municipal court." *Id.* This section appears to anticipate violation notices for health-related ordinance violations being issued by the director of health (or his or her inspectors) rather than by police officers.

Carlson argues that, to the extent that the ordinances may be interpreted to allow health inspectors to issue violation notices, they conflict with Chapter 84 of the Missouri statutes, which, she argues, grants the Kansas City police force the exclusive power to enforce the ordinances. While we agree with Carlson that the ordinances would be invalid in most cases if they conflicted with state statutes, we do not find that the ordinances conflict with the statutes in this regard; they merely supplement them. Kansas City police resources are undoubtedly unable to adequately enforce ordinances like the anti-smoking ordinance on a daily basis. Common sense dictates that the health inspectors be permitted to issue notices for such ordinance violations.

Moreover, Nieft did not act as a police officer in issuing Carlson the violation notice. Kansas City police officers are "peace officers" and thus subject to the provisions of chapter 590 of the Missouri statutes. That chapter specifically provides that peace officers, who must be licensed, exclude "any person who has no power of arrest." § 590.020.3(1). Nieft, who admitted that he did not have the authority to make arrests, was unarmed and did not, in any way, present himself to be a police officer. He did not arrest Carlson.[4] Nieft cannot even be said to have "stopped" Carlson within the meaning of the Fourth Amendment. When Nieft entered JC's Sports Bar and noticed

people smoking, he "introduced himself" to Carlson and asked her for her identification, which Carlson willingly showed him. There is no evidence that Nieft detained Carlson or restricted Carlson's movement or her activities. Presumably, Carlson continued to tend bar while Nieft was in the establishment. Carlson also clearly did not feel compelled to do anything Nieft requested her to do, as she admitted that she knew she was violating the anti-smoking ordinance and did so because her employer had instructed her to allow patrons to smoke, and she refused to sign the violation notice when Nieft asked her to do so.

Carlson's oral argument made much of the fact that liquor control agents carried special licenses as support for her contention that food inspectors must also be licensed to issue violation notices. However, unlike food inspectors, liquor control agents are expressly designated by statute as peace officers and, accordingly, required to obtain licenses as peace officers. § 311.630.1; *see also Arcelia's Mexicana, Inc. v. Supervisor of Liquor Control,* 824 S.W.2d 72, 74–75 (Mo.App. E.D.1991). This is because liquor control agents are specifically given "full power and authority to make arrests and searches and seizures" for violations of the state's liquor laws. § 311.630.1. As stated above, food inspectors do not have authority to arrest and, therefore, do not require licenses. *See* § 590.020.3(1). Carlson's attempt to analogize the activities of food inspectors with those of liquor control agents is thus not persuasive.

Because Nieft did not exceed his authority and did not act as a police officer, we find that the violation notice was properly issued to Carlson. Therefore, the subse-

---

4. Carlson halfheartedly asserts in her briefing that Nieft did, in fact, arrest her when he issued the violation notice. As explained in

this section, however, Nieft clearly did not arrest Carlson at any time. Carlson's counsel conceded as much at her trial.

quent information was valid, and the trial court did not err in refusing to dismiss Carlson's case.

## Conclusion

For the above-stated reasons, we find that the trial court's judgment against Carlson is proper. Nieft had sufficient authority to issue Carlson's violation notice, which later became an information, and there was sufficient evidence that Carlson violated the ordinance to support the judgment.

JOSEPH M. ELLIS, Presiding Judge, and ALOK AHUJA, Judge, concur.